UNITED STATES of America,
Plaintiff-Appellee,

v.

James Leland JOHNSON, Defendant-Appellant.

No. 27025.

United States Court of Appeals,
Fifth Circuit.

Aug. 13, 1970.

John R. Brown, Chief Judge, and Thornberry and Wisdom, Circuit Judges, concurred specially and filed opinion.

Godbold, Circuit Judge, dissented and filed opinion.

Jack W. Torbert, Gadsden, Ala., for appellant.

Wayman G. Sherrer, U. S. Atty., R. Macey Taylor, M. L. Alexander, Asst. U. S. Attys., Birmingham, Ala., for appellee.

Before JOHN R. BROWN, Chief Judge WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLD-BERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK and INGRAHAM, Circuit Judges.

PER CURIAM:

The Court en banc is of the opinion that the panel[1] correctly decided that inspections of motor vehicles performed by police officers, who were entitled to be on the property where the vehicles were located, which in no way damaged the vehicles and were limited to determining the correct identification numbers thereof were not searches within the meaning of the Fourth Amendment; and that alternatively, if either of such inspections constituted a Fourth Amendment search, then no search warrant was necessary because such inspections were reasonable and did not violate the right of the people to be secure in their persons, houses, papers or effects. To the extent that Glisson v. United States, 406 F.2d 423 (5th Cir. 1969) would find such a search or inspection constitutionally infirm, that decision is expressly overruled by this opinion.

1. 413 F.2d 1396.

THORNBERRY, Circuit Judge, joined by Chief Judge JOHN R. BROWN, and WISDOM, Circuit Judge, concurring specially:

We believe the inspection of serial numbers involved in this case were searches subject to the Fourth Amendment, but we concur in the result reached by the majority because we believe the searches were reasonable.

GODBOLD, Circuit Judge (dissenting):

I dissent from the conclusion that the "inspections" of the two vehicles were not searches within the meaning of the Fourth Amendment. In my view this conclusion is erroneous, and, in addition, was unnecessary to the decision because of the holding that if the "inspections" were searches they were reasonable. I pretermit discussion of reasonableness other than to say that I would remand for further development of the facts.

The original panel, and now the majority of the court en banc, seek to create a new doctrine under which the police are given access to the automobile of the citizen for the purpose of "inspecting" it in order to identify it. The means employed to create a right to "frisk" an automobile is that which the Supreme Court rejected in considering "stop and frisk" of the person, in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which is to carve out and isolate particular conduct from the reach of the Fourth Amendment by the semantic device of describing it as less than a "search" or "seizure."[1]

A search is no less a search because called an "inspection" or "checking." The mandate of the Constitution is not to be avoided by euphemisms.

*Terry* pointed the way by which in the encounter between police officer and citizen there can be achieved an appropriate balance giving due recognition to the governmental interest at stake and the citizen's interest in freedom from intrusion and in the security of his property. In *Terry* this was achieved by a narrowly drawn authority in the police officer to permit him to make a reasonable search sufficient to protect the governmental interest—in that case,

---

[1]. " * * * There is some suggestion in the use of such terms as 'stop' and 'frisk' that such police conduct is outside the purview of the Fourth Amendment because neither action rises to the level of a 'search' or 'seizure' within the meaning of the Constitution.[12] We emphatically reject this notion.

"[12]. In this case, for example, the Ohio Court of Appeals stated that 'we must be careful to distinguish that the "frisk" authorized herein includes a "frisk" for a dangerous weapon. It by no means authorizes a search for contraband, evidentiary material, or anything else in the absence of reasonable grounds to arrest. Such a search is controlled by the requirements of the Fourth Amendment, and probable cause is essential.' State v. Terry, 5 Ohio App.2d 122, 130, 214 N.E.2d 114, 120 (1966). See also, e. g., Ellis v. United States, 105 U.S.App.D.C. 86, 88, 264 F.2d 372, 374 (1959); Comment, 65 Col.L.Rev. 848, 860 and n. 81 (1965)."

"The danger in the logic which proceeds upon distinctions between a 'stop' and an 'arrest,' or 'seizure' of the person, and between a 'frisk' and a 'search' is twofold. It seeks to isolate from constitutional scrutiny the initial stages of the contact between the policeman and the citizen. And by suggesting a rigid all-or-nothing model of justification and regulation under the Amendment, it obscures the utility of limitations upon the scope, as well as the initiation, of police action as a means of constitutional regulation.

*        *        *        *        *

"The distinctions of classical 'stop-and-frisk' theory thus serve to divert attention from the central inquiry under the Fourth Amendment—the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security. 'Search' and 'seizure' are not talismans. We therefore reject the notions that the Fourth Amendment does not come into play at all as a limitation upon police conduct if the officers stop short of something called a 'technical arrest' or a 'full-blown search.' "
392 U.S. at 17, 19, 88 S.Ct. at 1877, 1879, 20 L.Ed.2d at 903, 904.

a search for weapons to the extent necessary to protect the officer—regardless of whether the officer has probable cause to arrest for a crime. All was done within the standards of the Fourth Amendment. Thus police action of the character authorized remained subject to constitutional scrutiny. There was retained "the utility of limitations upon the scope, as well as the initiation, of police action as a means of constitutional regulation." 392 U.S. at 17, 88 S.Ct. at 1878, 20 L.Ed.2d at 903. Rather than follow *Terry* the majority have adopted the course which it rejected as inappropriate, the creation, by verbal characterization, of an enclave of police activity exempt from the Constitution.

## 1.

The per curiam decision of the court en banc tells us only that the decision of the panel was correct. As I understand the decision of the panel of three judges on the "inspection" issue, in the light of the facts, it is this: a police "inspection" of a motor vehicle to determine the doorpost identification number and the secret number (either or both) is not a search within the meaning of the Fourth Amendment, if— (1) the police officer is entitled to be on the premises where the vehicle is located; (2) the "inspection" does not damage the vehicle; (3) the inspecting officer has information sufficient in nature and reliability to give him a "legitimate reason * * * to check the serial number."[2]

Each inspection was made at the place where the vehicle was located. The pickup truck was in the yard of Johnson's home. The nature of the police custody of the Chevrolet Impala is not revealed by the panel or majority opinion. The briefs tell us that Johnson was arrested almost two weeks after the "inspection" of the pickup, that he brought the Impala to the jail and parked it in the county's impounded automobile lot, and that the FBI was notified of the arrest and an agent came to the jail and examined the car for the confidential number on the frame. Thus, as I understand it, the decision does not purport to allow an officer to seize a vehicle and remove it elsewhere in order to make his "inspection." Nor is there involved in this case the constitutional propriety of a "stop" of a vehicle for purposes of "inspecting" it. This kind of investigative detention or seizure of a vehicle by means of either physical force or police authority (the practical effect of which often will be a restraint of liberty, at least temporary, of those in the vehicle), raises independent constitutional issues that are not presented by the "inspection" of Johnson's two vehicles, in each instance carried out where the police found it, parked and with no one in it. See *Terry, supra,* 392 U.S. at 20, n. 16, 88 S.Ct. 1868, 20 L.Ed.2d at 905.

On neither vehicle was there forced entry into a locked passenger compartment or motor compartment, by use of a key or otherwise. Thus I presume that the "damage" limitation allows entry only where entry is otherwise available—by opening an unlocked door or lifting an unlocked hood—and does not allow any forcing of entry by physical force, picking locks, use of skeleton keys or similar means even though the means neither dents the metal nor breaks the glass. Obviously the forced entry,

---

**2.** The language of the en banc per curiam is "inspections * * * limited to determining the correct identification numbers thereof." An "inspection" to determine the *correct* number, the number which *ought* to be on the vehicle, embraces a great deal more than the "inspection" authorized by the panel decision, which was to check the number which *is* on the automobile, i. e., "the mere checking of the serial number of an automobile in order more positively to identify it." Inspection to determine the *correct* number could include a generalized search of the glove compartment and interior for registration and documents of title. However, assume that the per curiam does not intend to broaden the scope which the panel gave to the examinations actually made in this instance.

whether by sledgehammer, skeleton key, or bent coat hanger, constitutes a much greater invasion of the citizen's privacy than the entry which consists only of opening an unlocked door or hood. If my understanding is wrong the majority have driven even a bigger hole in the Fourth Amendment than I think.

I assume that "legitimate reason * * * to check the serial number" means "legitimate reason to suspect that the car is stolen," which was the alleged "legitimate reason" in this instance, and not the whole world of police suspicion of people, places and events.

The majority decision does not rest upon the familiar power to search a vehicle incident to arrest of the occupants. It does not rest upon the warrantless search of a mobile instrumentality for contraband.[3] It does not stand on the power to search for weapons and fruits of a crime where there is probable cause to do so. Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 [June 22, 1970]. Since the decision is not limited to the Impala, it goes beyond the power of the police to identify an impounded vehicle to safeguard both owner and police.[4]

### 2.

I return to the Fourth Amendment itself: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."

All that is necessary to constitute a search is an "actual intrusion" into what is constitutionally protected. The scope of what is protected is no longer analyzed in terms of common law property

concepts or in physical or geographical terms, but in terms of the citizen's right to "the privacies of life"—his "right to be let alone." Texas v. Gonzales, 388 F.2d 145 (5th Cir. 1968).

* * * The landmark decision of Boyd v. United States, 1886, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746, first articulated the doctrine that the essence of the fourth amendment was protection against arbitrary intrusions into the privacies of life. The Supreme Court recently reaffirmed this principle in Warden, Maryland Penitentiary v. Hayden, 1967, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782, and went on to note that the Court has to an increasing extent discarded fictional property concepts in resolving the issues of privacy and public security.

*Id.*) at 147–148. In *Boyd* the Supreme Court phrased it thusly:

The principles laid down in this opinion affect the very essence of constitutional liberty and security. They reach farther than the concrete form of the case then before the court, with its adventitious circumstances; they apply to all invasions, on the part of the Government and its employees, of the sanctity of a man's home and the privacies of life. *It is not the breaking of his doors and the rummaging of his drawers that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty and private property,* where that right has never been forfeited by his conviction of some public offense; it is the invasion of this sacred right

---

3. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); Scher v. United States, 305 U.S. 251, 59 S.Ct. 174, 83 L.Ed. 151 (1938); Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

4. Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); Cotton v. United States, 371 F.2d 385 (9th Cir. 1967); United States v. Graham, 391 F.2d 439 (6th Cir. 1968).

*Cotton* and *Graham* are discussed, *infra.*
It is unclear that the impounded vehicle rationale would apply in any event, because, apparently, the FBI agent's inspection did not purport to be related to identification for the purpose of compliance with a valid procedure for recording and protecting impounded property.
As to a similar police power extending to an abandoned vehicle, see Williams v. United States, 382 F.2d 48 (5th Cir. 1967).

which underlies and constitutes the essence of *Lord* Camden's judgment. Initial emphasis added.)

116 U.S. at 630, 6 S.Ct. at 532, 29 L.Ed. at 751.

In his dissent in Olmstead v. United States, 277 U.S. 438 at 478, 48 S.Ct. 564, at 572, 72 L.Ed. 944 at 956 (1928), Justice Brandeis expressed it this way:

> They [the makers of our Constitution] conferred, as against the government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men.

This court expressly recognized the "right to be let alone" in Brock v. United States, 223 F.2d 681 (5th Cir. 1955), holding it an illegal search to stand on a man's premises and look in his bedroom window hoping to obtain evidence that would give the basis for a search warrant to search the house.

In Carroll v. United States, 267 U.S. 132, 153–154, 45 S.Ct. 280, 69 L.Ed. 543, 551–552 (1924), the Supreme Court considered this right in the particular context of the automobile.

> * * * It would be intolerable and unreasonable if a prohibition agent were authorized to stop every automobile on the chance of finding liquor, and thus subject all persons lawfully using the highways to the inconvenience and indignity of such a search. Travelers may be so stopped in crossing an international boundary because of national self-protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in. But those lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search unless there is known to a competent official authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise.

This court has recognized that a search ordinarily implies an examination of an individual or of his property to discover contraband or evidence of some violation of the law, to be used in prosecution of a criminal action, United States v. Pennington, [No. 27213, 5th Cir., June 29, 1970]; Marshall v. United States, 422 F.2d 185 (5th Cir. 1970).

In a host of cases the movable nature of the automobile has been considered as a factor in determining whether a warrantless search of an automobile is reasonable.[5] These cases do not suggest that "inspecting" or "checking" an automobile is less than a search or that the movable character of an automobile causes it to be an "effect" in which the citizen has no privacies of life and no right to be let alone. Rather they reiterate the applicability of the Fourth Amendment while finding standards of reasonableness less stringent.

The ubiquitous, movable and moving automobile has such overwhelming impact on modern American life that it is all too easy to slip into focusing on the *thing* subjected to police action, to fall unwittingly into the feeling that, after all, it doesn't amount to much to open a car door or lift the hood. But the Fourth Amendment protects people, not places. Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576, 582 (1967). To attempt to decide whether an "area", in the sense of a tangible place or thing (in *Katz,* a telephone booth) is constitutionally protected deflects attention from the genuine Fourth Amendment problem, which is protection of the interest of the citizen himself. *Id.* Paraphrasing *Boyd,* it is not the opening of the car door or the lifting of the hood that is the essence of the offense but "the invasion of [the citizen's] indefeasible right of personal security, personal liberty and private property."

"This inestimable [Fourth Amendment] right of personal security belongs

---

5. *E. g.,* Chambers v. Maroney, *supra*; Carroll v. United States, *supra*; Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964).

as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs." *Terry, supra,* 392 U.S. at 8–9, 88 S.Ct. at 1873, 20 L.Ed.2d at 898.

And, as *Terry* points out, 392 U.S. at 12, 88 S.Ct. 1868, 20 L.Ed.2d at 900, the issue is not the abstract propriety of police conduct but the admissibility of evidence secured by the search. The rule excluding the evidence operates as the principal deterrent to unlawful police conduct.[6]

However, as Justice Harlan's concurring opinion in *Katz* points out, to say that the Fourth Amendment protects people and not places is not enough. The citizen's right to privacy is not subjectively absolute for each person but must be viewed in terms of reasonable expectation of being let alone. Thus, Justice Harlan contrasts the privacy of one's home, or of the telephone booth with the door closed, with objects, activities or statements carried on in plain view.

We are not told by either opinion in this case why the lesser "legitimate reason" standard[7] applies to invading the citizen's property for the purpose of making an identification, while other and more stringent standards apply to invading it for other reasons which may be much more compelling. Society has no less interest, perhaps even greater interest, in "inspecting" suspicious cars for guns, stolen money and narcotics than in "inspecting" them for identification numbers. If the emphasis is upon the "thing," the bank robber with guns and money in his car, or narcotics trafficker with drugs, has no more reasonable expectation of privacy in those items than has the car thief in his door plate,

perhaps even less. But the officers in Chambers v. Maroney were not authorized to "inspect" the cars for guns, money, green sweater and trench coat because they had a "legitimate reason." They could invade the citizen's right to be let alone, and to have his car let alone, because—and only because—there was probable cause to examine the car for guns and weapons, stemming from the same circumstances that constituted probable cause for arrest.

In his dissenting opinion in *Chambers,* Justice Harlan suggests that probable cause is never alone sufficient to search without a warrant, but that other and exigent circumstances are required. Thus under all views articulated in *Chambers,* there has to be at least probable cause for the police officer to override the citizen's right to have his property free from governmental invasion.

"Probable cause" is not a mere shibboleth to be cavalierly discarded.

The requirement of probable cause has roots that are deep in our history. The general warrant, in which the name of the person to be arrested was left blank, and the writs of assistance, against which James Otis inveighed, both perpetuated the oppressive practice of allowing the police to arrest and search on suspicion. Police control took the place of judicial control, since no showing of "probable cause" before a magistrate was required. The Virginia Declaration of Rights, adopted June 12, 1776, rebelled against that practice:

"That general warrants, whereby any officer or messenger may be commanded to search suspected places without evidence of a fact committed, or to seize any person or persons not

---

6. As I discuss below, this consideration is broadened in this case by the stated government position that the information secured may confer the right to arrest and be the basis of an unassailable generalized search.

7. We say "lesser" standard because the phrase is employed rather than "prob-

able cause." The government, in its brief, asks for judicial affirmation of "legitimate reason" as something less than probable cause. Would like to read "legitimate reason" and "probable cause" as the same but cannot fairly do so.

named, or whose offence is not particularly described and supported by evidence are grievous and oppressive, and ought not to be granted."

The Maryland Declaration of Rights (1776), Art. XXIII, was equally emphatic:

"That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants—to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special—are illegal, and ought not to be granted."

And see North Carolina Declaration of Rights (1776), Art XI; Pennsylvania Constitution (1776), Art X; Massachusetts Constitution (1780), Pt I, Art XIV.

That philosophy later was reflected in the Fourth Amendment. And as the early American decisions both before and immediately after its adoption show, common rumor or report, suspicion, or even "strong reason to suspect" was not adequate to support a warrant for arrest. And that principle has survived to this day. See United States v. Di Re, 332 U.S. 581, 593–595, [68 S.Ct. 222, 227, 228], 92 L.Ed. 210, 219, 220; Johnson v. United States, 333 U.S. 10, 13–15, [68 S.Ct. 367, 368, 369], 92 L.Ed. 436, 439–441; Giordenello v. United States, 357 U.S. 480, 486, [78 S.Ct. 1245, 1252], 2 L. Ed.2d 1503, 1509. Its high water was Johnson v. United States (US) supra, where the smell of opium coming from a closed room was not enough to support an arrest and search without a warrant.

Henry v. United States, 361 U.S. 98 at 100–101, 80 S.Ct. 168 at 170, 4 L.Ed.2d 134 at 137–138 (1959). The discard of

the requirement of probable cause gives to the police officer *greater* authority to initiate police action than could be exercised by a dispassionate magistrate requested to issue a search warrant. This police authority is all the more dubious when it is coupled with the absence of constitutional regulation over the scope of what has been initiated (except by the awkward and artificial device of saying that at some point the "investigation" has progressed so far that it has become a search.)

An argument can be constructed that there is a difference where the police invasion is to seek identification numbers. *I.e.,* because identification numbers, secret and otherwise, are for identification purposes the citizen can have no reasonable expectation of their remaining private—they are for identification, *ergo*, the citizen must expect them to be available to the police for the purpose for which intended. But the function of being an identification device does not exempt the device itself, or the instrumentality it identifies, from the Fourth Amendment. In our increasingly complex world our motor vehicles are not the only things numbered for identification. So are such tangible effects as household appliances, lawn mowers, outboard motors, and even the watches on our wrists. Add to the list such papers and documents kept in home, safe deposit box or on the person, as bank checks, drivers' licenses, social security cards, credit cards, insurance policies, securities, and deeds and mortgages, and the automobile registration papers often carried in the glove compartment of the car.[8] All of these items have primary or secondary qualities of identification, but this does not subject them, when not in plain view, to being sought out by police action beyond the reach of the Fourth Amendment.[9]

8. It is difficult to see any rational distinction between opening the door or the hood to obtain an identifying number stamped on metal, and opening the glove compartment to examine the registration so often carried there to obtain the identifying number stamped on a piece of paper.

9. Of course, observation of an automobile license plate is not a search when the vehicle is exposed to public observation.

It is revealing to retrace the route which has led from an uncertain and doubt-filled one-sentence remark on a side issue in a dissenting opinion to a new principle of constitutional dimension. Simpson v. United States, 346 F. 2d 291 (10th Cir. 1965), held unconstitutional a warrantless search for vehicle identification numbers, for which purpose the FBI agent entered the car. The court held it "ha[d] every aspect of the classic but prohibited exploratory search for evidence of crime." *Id.* at 295. A later obtained cellophane tape impression of the secret number also was held invalid. The case was reheard en banc on the issue of standing. Two dissenters were chiefly concerned with that issue, but also they said:

> * * * Possibly what I am saying is that the obtaining of a serial number from a motor vehicle is not a search at. all. If it is not, we reach the same result as though it were a reasonable search within the meaning of the Constitution.

> It is no answer to say that a rule contrary to that adopted here would permit an indiscreet officer to promiscuously search automobiles with immunity and that the laws must apply equally to the guilty as to those who are not guilty. If a search of an automobile is made without probable cause, one having the right to complain may recover damages and suppress any incriminating evidence which is seized. Such remedies are equally available to a guilty person, provided he has the right to question the search.

*Id.* at 297.

Next came Cotton v. United States, 371 F.2d 385 (9th Cir. 1967), and United States v. Graham, 391 F.2d 439 (6th Cir. 1968). In the present case the panel relied on these two cases but eschewed either discussion or analysis of them. In *Cotton* the car was in police custody, taken over under circumstances in which the officer would have been derelict in his duty to safeguard it had he left it unattended in the middle of the night in a dark alley. After the suspect was arrested (an arrest not held invalid) and taken to the station, the single, arresting officer waited at the scene for a tow truck and filled out a "tow slip" with a description of the car, including the serial number, which he obtained by opening the door. On the "tow slip" he acknowledged his responsibility for the vehicle and the property in it. As to his examination of the car, the decision rests squarely on his duty to make and keep a record of impounded property. "[T]he mere opening of the door of the car *for the purpose of making such a record* [is not], under the circumstances, a search, but if it was, the circumstances under which it was done make that search an entirely reasonable one." (Emphasis added.) 371 F.2d at 392. A second examination of the car was made later the same morning at the police pound by an FBI agent, who also secured the doorpost number by opening the door. The court held, "it is not a search at all, under such circumstances as we have here." *Id.* at 393.

*Cotton* is understandable because an accused has no reasonable expectation of privacy in his property, once the police have taken it into custody pursuant to their duty to safeguard it, and must protect the property and themselves by making a record of that for which they have assumed responsibility. But this has not the slightest application to Johnson's pickup truck, "inspected" in the yard of his home in his absence. And probably it has nothing to do with the FBI agent's examination of Johnson's car in the lot at the jail.

The "legitimate reason" verbiage employed in the present case originated in *Cotton* in the Ninth Circuit's discussion of the second examination of the car.

---

But the reason is not one of convenience to the police or that it is a handy identification device, but that there is no reasonable expectation of privacy in what is in plain view. United States v. Graham, 391 F.2d 439, 442 n. 2 (6th Cir. 1968).

371 F.2d at 393. But the Ninth Circuit relied upon what the dissenters had said in a single sentence of *Simpson,* and the Ninth Circuit did not note that the dissenters had recognized that there had to be probable cause.[10]

*Graham* is the same type of case as *Cotton,* on which it relies. The court found there was no search on the ground the cars were at the police station, lawfully in custody for safekeeping, a custody lawfully obtained from a suspect lawfully arrested so that no right of privacy had been breached.[11]   391 F.2d at 442.

In this circuit, in United States v. Greer, 297 F.Supp. 1265 (N.D.Miss. 1969), District Judge Keady has given to *Cotton* and *Graham* the careful analysis which this court has declined to give. *Greer* is remarkably similar on the facts to Johnson's pickup. Officers went to the home of a suspect, without a warrant, to obtain the vehicle identification number of an automobile they suspected was stolen. They were given the keys by the suspect's wife, unlocked the car and took the doorpost number. The government contended the examination was not a search. Judge Keady held that it was a search. He recognized that *Cotton* and *Graham* were limited to the situation in which the automobile is in safekeeping or is already otherwise lawfully available to the policeman. In language which applies precisely to Johnson's pickup he held:

> In short, those decisions cited by the government serve not to foreclose defendant's contention, but rather to bolster it. The undisputed facts here are that FBI agents entered without warrant upon private, protected property of one in possession of an automobile which they examined in order to confirm a mere suspicion that it had been stolen. The defendant had not been arrested, had in no way consented to any search of his private property and

was absent when the examination took place. Their activity clearly constituted a "search" protected by the Fourth Amendment. That being true, law officers "must justify their conduct before courts which have always been, and must be, jealous of the individual's right of privacy within the broad sweep of the Fourth Amendment." United States v. Rabinowitz, 339 U.S. 56, 66, 70 S.Ct. 430, 435, 94 L.Ed. 653 (1950). Under the totality of the circumstances surrounding the examination of the automobile by Agents Neely and Mearns, the search, made without justification or necessity, was unreasonable, requiring the suppression of any evidence obtained therefrom. Holzhey v. United States, 223 F.2d 823 (5th Cir. 1955).

297 F.Supp. at 1269. Mrs. Greer's consent, by giving the keys, was at least as broad as Mrs. Johnson's insofar as giving some sort of right to be on the premises.

Weaver v. United States, 374 F.2d 878 (5th Cir. 1967), is a slender reed. The accused, under a state arrest not held unlawful, voluntarily gave an FBI agent a copy of his automobile registration, showing the identification number. Subsequently local police opened the car door and the agent observed the doorpost number and saw it to be the same. Later the FBI agents furnished the number to Georgia officials, who arrested the accused when he appeared there, and it developed that the vehicle was stolen. This court held that the identification number, used to initiate the government's case, was not illegally obtained because voluntarily supplied by the accused from an independent, lawful source. In an elliptical dictum, the court then said:

> Because of our ruling that the evidence sought to be suppressed was obtained from an independent, lawful source, it is unnecessary for us to decide whether the visual search by Lou-

---

10. See the discussion of *Simpson, supra,* following footnote 9.

11. In addition, the court found that by the time the "inspection" occurred the police had probable cause to believe that the cars were stolen.

derman was illegal or not. However, the method which Agent Louderman used to obtain the public identification number of the vehicle was nothing more than a routine questioning of a person arrested from out of the state. His subsequent checking of the number of the vehicle was mere routine. In this highly motorized age with millions of vehicles traversing the nation's highways and the mounting number of automobile thefts and related crimes, it would tax the imagination if we were to consider *under these circumstances* [emphasis added] that a visual inspection by an FBI agent of a car identification number constituted a search, much less an *illegal* search. The Fourth Amendment constitutional prohibition is against *unreasonable* [emphasis in original] searches and seizures.

*Id.* at 882. This is hardly a square decision that an "inspection" is not a search. But if the *Weaver* dictum has any scope, it is far less sweeping than what is articulated in the instant case. Weaver voluntarily gave the FBI agent a copy of his Georgia registration showing the car's identification number. The agent told Weaver he wanted to make a routine check of the car, and there was no evidence that Weaver objected. *Id.* at 880. Weaver had little expectation of privacy left.

In United States v. Nikrasch, 367 F.2d 740 (7th Cir. 1966), there was no evidence of police impounding or inventorying. The defendant and his female companion were arrested for disorderly conduct, and he drove his own car to the station, and on the officer's request gave him his keys. Hours later another officer examined both doorpost and secret numbers. The Seventh Circuit held the warrantless searches were unreasonable and violated the Fourth Amendment.

12. 19 Howell, St.Tr., 1029.

13. Boyd v. United States, 116 U.S. at 626, 6 S.Ct. at 530, 29 L.Ed. at 749 (1886).

14. The governmental interest will in due course become less urgent. Most new

In Massey v. United States, 358 F.2d 782 (10th Cir. 1966) the Tenth Circuit held valid a doorpost search because incident to arrest, but invalidated a search for the secret number conducted the next day at a garage (the government conceded this search was illegal).

The decision that an "inspection" is less than a search is, of course, a rule of convenience. The government commences its brief with recitals of the growing number of stolen car cases and its need to be able to identify them. The argument of the utility of a search (by whatever euphemism styled) as a means to detect offenders by discovering evidence is not something new and relating only to automobiles. It was made to Lord Camden in 1765, and in his memorable opinion in Entick v. Carrington,[12] described by our Supreme Court as "one of the landmarks of English liberty,"[13] he rejected it.

This is not to say that the governmental interest does not require and deserve protection or that it does not represent a sensitive aand important area of police activity. The problem is safeguarding the government's interest in a manner that is consistent with the Constitution and does the least damage to the citizen's right to be free from governmental scrutiny, intrusion and examination.[14]

### 3.

This case peculiarly exemplifies the value of the consideration expressed in *Terry*, that taking police conduct outside the Fourth Amendment by semantic distinctions "suggest[s] a rigid all-or-nothing model of justification and regulation under the Amendment, it obscures the utility of limitations upon the scope, as well as the initiation, of police action as a means of constitutional regulation."

automobiles already are being manufactured with the identification number on the dashboard rather than on the doorpost, where it is in plain sight and may be viewed from outside the car.

392 U.S. at 17, 88 S.Ct. at 1878, 20 L.Ed. 2d at 903. Without analysis or discrimination the majority progress from the doorplate—placed there for anyone to see upon the opening of a door which in daily use of the car will be opened many times—to the confidential number, placed on the vehicle in a location known generally only to law enforcement officers. In this case, as to the blue Corvette of Count One:

> * * * This agent had the serial number and the motor number of Johnson's blue Corvette, taken from a confidential location on the frame of the vehicle. By the use of gasoline he cleaned off the numbers, rubbed fingerprint ink over them, laid over a piece of scotch tape, picked up the ink, laid it across a white piece of paper, and by that method could read the number. * * *

Any attorney who has tried many Dyer Act cases is familiar with the use of paint removers, grease-dissolving solvents, steam cleaning, lifting the car on a hoist, cellophane tape, and even detection devices [15] to find and "lift" the secret number.[16]

As a result of the decision in this case, the allowable limits of the police action are to be measured not by familiar Fourth Amendment standards but by a new body of law which eventually will have to say that at some point the "inspection" for the number will become so invasive and pervasive that "just identifying" will become "searching." Similarly, one can foresee—and the cloud on the horizon is considerably bigger than a man's hand—the coming argument over the item observed for the first time in plain view when the door is opened to "inspect" the doorplate.[17]

Litigants, even our government, do not direct what and how courts decide. But there need be no misunderstanding about what the government has in mind about automobile searches. Its brief for this case en banc includes these contentions:

(1) "Legitimate reason" is less than probable cause to assume a vehicle is stolen. It includes "suspicious circumstances of a minimum kind."

(2) The power to make the "inspection" for identification carries with it the power to stop the vehicle for that purpose.

(3) If the "inspection" discloses that the car is stolen the operator can be arrested, the car impounded and a generalized search of the car carried out.

---

15. United States v. Mason, 290 F.Supp. 843 (D.N.H.1968) held it a violation of the Fourth Amendment to remove cars from defendant's garage, take them to an adjacent garage, put each on a hoist, and examine them by a specialized detection instrument to secure the confidential numbers. See also Massey v. United States, *supra*, in which the government conceded that its search for the secret number was invalid.

16. As to the pickup, we are not told where the secret number was located or what means was used to obtain it, only that the FBI agent "made a list of it." As to the Impala, the briefs tell us that the agent examined the car for the confidential number on the frame.

  I do not foreclose the possibility that the confidential number may be located on the frame or elsewhere in a place sufficiently open to view that observation of it is not a search. *Cf.* United States v. Gunn, 428 F.2d 1057 [5th Cir., June 25, 1970] holding valid the copying of serial numbers from the tires on a vehicle. On one tire the number faced outward, on others they faced inward and the agent had to crawl under the car to find them.

  The problem with respect to the "secret" number is not that it is called "secret," or that it is useful for identification, but whether the citizen has a reasonable expectation of privacy and security and whether that interest has been invaded by the police action occurring. The number may not be sought out exempt from the Fourth Amendment merely because it is a useful identification device, nor is it automatically within the Fourth Amendment because it is styled "secret."

17. "[T]he plain view rule must be upheld where the viewer is rightfully positioned, seeing through eyes that are neither accusatory nor criminally investigatory." Marshall v. United States, 422 F.2d 185 at 189 (5th Cir. 1970).

The camel's nose has become a large camel very quickly.

The language of *Boyd* is especially apropos:

> * * * It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. * *

116 U.S. at 635, 6 S.Ct. at 535, 29 L.Ed. at 752.

I respectfully dissent.