UNITED STATES of America, Plaintiff-Appellee,

v.

Charlie MARCANTONI and Suzanne Marcantoni, Defendants-Appellants.

No. 77–5140.

United States Court of Appeals, Fifth Circuit.

March 7, 1979.

William P. Levens, Tampa, Fla. (Court-Appointed), for C. Marcantoni.

John N. Jenkins, Tampa, Fla. (Court-Appointed), for S. Marcantoni.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Gary J. Takacs, Asst. U. S. Atty., Tampa, Fla., for plaintiff-appellee.

Before WISDOM, TJOFLAT and VANCE, Circuit Judges.

TJOFLAT, Circuit Judge:

Charlie and Helen Suzanne Tune Marcantoni, husband and wife, were convicted in two counts of armed bank robbery and assault with a dangerous weapon during the commission thereof in violation of 18 U.S.C. §§ 2, 2113(a), (d) (1976).[1] In this appeal, the

---

1. The federal bank robbery statute, 18 U.S.C. § 2113 (1976), provides in relevant part:

(a) Whoever, by force and violence, or by intimidation, takes . . . from the person . . . of another any . . . money . . . belonging to, or in the care, custody, control, management, or possession of, any bank . . . or any savings and loan association . . . [shall be fined and/or imprisoned].

(d) Whoever, in committing, or in attempting to commit, [a violation of subsection (a), above] assaults any person, or puts in jeopardy the life of any person by the use of a

Marcantonis contend that their convictions were obtained by the Government's use of the fruits of a search of their residence conducted in violation of the fourth amendment to the Constitution. The Marcantonis also contend that reversible error occurred in the court's admission of some damaging evidence tending to show that a part of the "bait money" taken during the robbery was in their possession three days later. We find no merit in this latter contention. As for the former, it is unnecessary for us to determine the validity of the alleged search because any error that the district court may have committed in admitting the fruits thereof was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Consequently, we affirm the Marcantonis' convictions.

**I**

On Friday, August 6, 1976, at approximately 9:10 a. m., a white male, standing 5'9"–5'10", weighing 170–180 pounds, and wearing a motorcycle helmet with tinted brown sun visor, entered the Tampa Federal Savings & Loan Association (the Bank), Tampa, Florida, and went to the only teller window open at that time. The teller, Tina Brown, looked up into the barrel of a shotgun, screamed and ducked to the floor. The head teller, Debra Beckerink, realizing the situation, walked to Ms. Brown's window and began pulling bills of small denominations out of the money drawer and placing them in a bag. The gunman nervously commanded Beckerink to "give [him] the big bills." Record, vol. 3, at 10. She complied, supplying him in the process with $3,791.00, including ten $10 bills of bait money.[2] The gunman then ran out of the Bank, firing a shot at the sidewalk as he left, and jumped into the back seat of a waiting getaway car being driven by a white, blond-haired female. The getaway car and its occupants were observed by various witnesses. When the Tampa police arrived on the scene moments later, the witnesses gave the officers a description of the vehicle, a 1966 light green Rambler station wagon with luggage racks on the top, and its Florida license tag number. A search of the Florida vehicle registration records disclosed that the tag had been issued to Helen Suzanne Tune Marcantoni for a 1966 Rambler station wagon.

Detectives from the Tampa police department and agents of the Federal Bureau of Investigation went immediately to the residence indicated for Mrs. Marcantoni on the registration but found that she and her husband had moved. The investigation led to her parents' house where the officers learned that the Marcantonis had moved to a house at 3416 Rogers Avenue, in Tampa, which was owned by Mr. Marcantoni's mother. The officers were told that the Marcantonis were either at home or on a camping trip to Ocala, Florida. At about 7:30 p. m. that evening, several police officers and FBI agents arrived at the Rogers Avenue address, a hedge-and-bush-surrounded lot with a house in the middle. In front of the house was a four-foot chain-link fence with a locked gate at the driveway. The four-foot fence extended partway around the perimeter of the lot. On one side the lot was bounded by a neighbor's fence 2.5'–3' high which, to the officers, appeared to be rather flimsy. From the street the investigators could see a light-green Rambler station wagon, fitting the description given them by the eyewitnesses, parked to one side of the lot. The right front end of the wagon was enveloped by some shrubbery, as if the wagon had been driven into the bushes.

Several of the eyewitnesses were transported to the scene to determine whether

---

dangerous weapon or device [shall be fined and/or imprisoned].

The Marcantonis were also charged, under 18 U.S.C. § 2 (1976), with aiding and abetting one another in the violation of section 2113(a) and (d).

**2.** Bait money was kept in each teller's money drawer. When the bait money in question was removed, a silent alarm to the Tampa Police Department activated. The denominations, serial numbers, series years, and the bank of issue of each bait money bill had been recorded by the Bank.

the Rambler was the getaway car. One of the witnesses was Charles H. Palleja, who had happened to be driving by the Bank as the Rambler was fleeing the scene and had taken up the chase; he had been able to follow the Rambler closely for several minutes, record its tag number and get a good look at its occupants. When Palleja arrived at 3416 Rogers Avenue, he promptly identified the Rambler as the getaway car. One of the things Palleja had noticed earlier about the station wagon was a red plaid carpet tacked to the back of the rear seat. The station wagon standing in the Marcantonis' yard also had a red plaid carpet tacked to its back seat.

At some time during the investigation at 3416 Rogers Avenue, the officers decided to approach the house to see if the Marcantonis were at home. They entered the property by stepping over the neighbor's 2.5'–3' fence and went directly to the front door of the Marcantoni residence. Receiving no response, they proceeded to the back door; again, they received no response. On their return to the front of the house the officers noticed that the license tag to the Rambler had been removed. They decided to walk over to the car to examine the vehicle identification number (VIN), which was visible on the dash through the front window, in an attempt to resolve any doubt as to the identity of the registered owner of the car. The VIN turned out to be the same one disclosed by the vehicle registration information the officers had obtained earlier, which had indicated that Suzanne Marcantoni was the owner. Though probable cause existed to justify a search of the car (and perhaps to arrest the Marcantonis), the officers decided to forego the obtainment of a warrant and to impound the vehicle; it was promptly taken to the Tampa Police Department impoundment lot. There an inventory search was conducted and some photographs of the vehicle's exterior were taken.

The next evening the FBI, accompanied by Tampa police, located the Marcantonis at Disney World, near Orlando, Florida, and questioned them about the robbery. The Marcantonis denied any involvement. The following Monday morning, August 9, 1976, Charlie Marcantoni consented to and assisted in a search of his Rogers Avenue residence by the Tampa police. During the search, Detective Edward Brodesser examined several hundred dollars in currency and recorded the serial numbers from the faces of the $10 bills he found, but he did not seize the bills. Later in the day separate lineups were conducted with respect to each of the Marcantonis, and they were identified as the gunman and driver involved in the robbery.

On August 13, 1976, Detective Brodesser returned to the Marcantoni residence on Rogers Avenue with a search warrant authorizing the seizure of any of the bait money that might be there. Following his August 9 search of the residence Brodesser had learned that the serial numbers he had recorded from two of the $10 bills he had uncovered during the search matched the serial numbers of two $10 bills on the Bank's list of the bait money taken in the robbery. Brodesser was unable to find these bills on August 13, however, when he returned with the search warrant. Six days later the Marcantonis were indicted.

At the trial, the Government proved its case mainly through the testimony of three Bank tellers who witnessed the robbery, two bystanders who witnessed the getaway, and Detective Brodesser and an expert from the U.S. Bureau of Printing and Engraving who, together, established that two of the $10 bills seen by Brodesser during his initial search of the Marcantoni residence were part of the bait money. At issue in this appeal are (1) Detective Brodesser's testimony concerning the bills and (2) the fruits of an allegedly illegal search of the 3416 Rogers Avenue property, to wit: the VIN of the Rambler station wagon and the photographs taken of the Rambler at the police station.

As we shall point out, Brodesser's testimony concerning the bait money was properly received. We need not determine whether the trial court's reception of the VIN and the photographs of the Rambler

was proscribed by the fourth amendment, since the evidence of guilt as to each appellant is so overwhelming that we can safely say that if the admission of the questioned evidence was error, it was harmless beyond a reasonable doubt.

## II

The argument advanced by the Marcantonis in the court below and on appeal in support of their objection to Detective Brodesser's testimony concerning the two $10 bills has been articulated inartfully at best. Giving the Marcantonis the benefit of every doubt, we read their argument as posing alternative objections to admissibility: (1) Detective Brodesser's testimony was irrelevant because it lacked probative value; (2) his testimony violated the best evidence policy embraced by Fed.R.Evid. 1004.

When Brodesser copied the serial numbers of the two $10 bills, he neglected to record all of the essential identifying data printed on the face of each of the bills—he omitted the series year. Knowledge of the series year was necessary, according to the Government's expert from the Bureau of Printing and Engraving, William Holland, to resolve any possible doubt whether the two bills Brodesser saw were bait money. Holland explained that each of the serial numbers Brodesser copied from the bills had been used by the Bureau on $10 bills in three separate series or years: series 1934A, 1950A, and 1969C. The $10 bills used as bait money were of the 1969C series.

The Marcantonis first objected[3] to Brodesser's testimony about the serial numbers he had seen on the ground that the testimony would prove absolutely nothing;

without the series year, they claimed, the jury could not find that either of the $10 bills found at their residence actually came from the Bank. The Government's response to this attack lies in the balance of Holland's testimony, considered in the unique circumstances of this case. Holland explained that the average life of a $10 bill is three and one-half years; thus there is very little chance that any of the series 1934A or 1950A bills were in circulation at the time of the robbery. Record, vol. 4, at 116–18. He further pointed out that series 1934A bills are so rare that they are worth four to five times their face value and are collectors' items, making it extremely unlikely that any of those bills were still in active circulation in 1976. Id., at 118. And chances are not much better that any of the series 1950A bills were then in circulation either. Holland's opinion was, therefore, that the two $10 bills Detective Brodesser uncovered were of the 1969C series and part of the Bank's bait money. He reinforced his opinion by observing that the odds are "extremely remote," id., at 116, that a $10 bill from the 1934A or 1950A series with the same serial number as one of the bait bills could have found its way to the Tampa Bay area at the same time as the bait bills; the odds were "hundreds of times greater" that two sets of such bills could have been in the Tampa Bay vicinity at once. Id. Given Holland's opinion and the independent evidence establishing that Charlie Marcantoni left the Bank with bait money of the same serial numbers and denominations as those found in his home a short time later, the trial judge properly concluded that Brodesser's testimony con-

---

3. The Marcantonis' objection, asserting relevancy and best evidence grounds, to Brodesser's testimony concerning the serial numbers was made at a pretrial suppression hearing. Supp. Record, vol. 2, at 19–20. After counsel were heard, the objection was overruled. At trial, defense counsel advised the court that they desired a "continuing objection" to Brodesser's publication of the serial numbers to the jury. Since defense counsel articulated no specific basis for their continuing objection, we presume that it was made on the grounds advanced previously at the pretrial hearing. Both

the prosecutor and the trial judge acquiesced in the defense's preservation of their objection through the continuing objection device. Without commenting on the propriety or desirability of utilizing the continuing objection device as a means of preserving a claim of error, especially when, as here, the procedural posture of the case and the state of the evidence undergo substantial change as the trial progresses, we treat the Marcantonis' objection, as framed at pretrial, as having been preserved for appellate purposes.

cerning the serial numbers had probative value.

The Marcantonis' alternative objection to the reception of Brodesser's testimony is that rule 1004 required the Government to introduce the two bills in evidence. Brodesser's testimony, they argue, was secondary evidence of the contents of the bills and not admissible because the Government failed to establish any of the conditions to the admissibility of secondary evidence specified by Fed.R.Evid. 1004. That rule states,

> The original is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if—
>
> (1) *Originals lost or destroyed.* All originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith; or
>
> (2) *Original not obtainable.* No original can be obtained by any available judicial process or procedure; or
>
> (3) *Original in possession of opponent.* At a time when an original was under the control of the party against whom offered, he was put on notice, by the pleadings or otherwise, that the contents would be a subject of proof at the hearing, and he does not produce the original at the hearing; or
>
> (4) *Collateral matters.* The writing, recording, or photograph is not closely related to a controlling issue.

The Government made no formal attempt to qualify Brodesser's recital of the incriminating serial numbers as secondary evidence admissible under the rule. First, as the Government concedes, it did not undertake to show that the two bills were lost or destroyed. Second, it was not established that the Marcantonis were served notice that the contents of the bills would be a subject of proof at trial, and no process was directed to them to produce the bills in

court. Finally, the Government did not, and in our opinion could not, contend that the evidence was "not closely related to a controlling issue."

There was little if anything in the argument of counsel that even addressed the qualifications of rule 1004 or, much less, whether they had been met in this instance. In overruling the Marcantonis' objection, the trial judge, quite understandably we think, gave no reasons for his decision. Consequently, we cannot determine whether the court treated Brodesser's statements about the serial numbers as secondary evidence,[4] and, if so, which of the conditions to admissibility prescribed by the rule it found to be fulfilled.

■ If, in truth, the court considered Brodesser's testimony to be secondary evidence, we must assume that the court was satisfied that at least one of those conditions had been established. It should have been obvious after Detective Brodesser's return to the Marcantoni residence with a search warrant failed to produce the two $10 bills in question that the bills would not be available to the prosecution for trial. We have no difficulty in concluding that, under the circumstances of this case, the trial judge would have been authorized to find, under section (1) of the rule, that the two bills were "lost or [had] been destroyed." Surely, the Marcantonis could not have contended that the unavailability of the bills was the product of Government "bad faith." The trial judge could also have found, under section (2) of the rule, that "[n]o original [could] be obtained by any available judicial process or procedure." Even assuming that the Marcantonis were amenable to a subpoena directing the production of the bills at trial,[5] we think it unrealistic to expect that they would have readily produced the two instruments that would have made the Government's case

---

4. It is conceivable that the court viewed Brodesser's statements as present recollection refreshed or as past recollection recorded. Fed. R.Evid. 803(5). See note 6 *infra.*

5. We think it fairly debatable whether the Marcantonis could have been compelled, in the face

of the fifth amendment privilege against self-incrimination, to produce the two $10 bills for use by the prosecution at trial. *See generally Bellis v. United States,* 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974); *United States v. Hankins,* 565 F.2d 1344 (5th Cir. 1978).

against them complete. In short, the Government was not required to go through the motion of having a subpoena issued, served and returned unexecuted in order to establish, under section (2), that the bills were unobtainable.

 As for section (3) of the rule, a legitimate argument can be made on this record that the Marcantonis were "put on notice" that the serial numbers of the two $10 bills "would be a subject of proof" at the trial, and that, having not produced them at trial, the Marcantonis could not object to the use of Brodesser's notes. In sum, although the trial judge, in overruling the Marcantonis' best evidence objection, should have announced the predicate to admissibility he found to have been established under rule 1004, his decision to receive the evidence was correct.[6]

### III

We now turn to the Marcantonis' contention that their conviction is infirm because it was obtained by the prosecution's use of the fruits of an illegal search at their Rogers Avenue residence. The illegal search occurred, they argue, during the course of Detective Brodesser's investigative inquiry at the residence on the evening following the robbery. The Marcantonis concede that Brodesser had a right to come on the property for the purpose of inquiring of their whereabouts,[7] but, they submit, this entitled him only to walk directly to the front and back doors of the residence. Brodesser deviated from this route when he traversed the yard a distance of fifteen feet to view the VIN of the Rambler. This deviation, the argument proceeds, could not be made without a warrant issued on probable cause.

 The allegedly tainted evidence derived from this warrantless search of the Marcantonis' premises is the VIN and two color photographs of the Rambler, Government Exhs. Nos. 5a & c, taken following the vehicle's impoundment.[8] Our review of the record in this case has convinced us that even if Brodesser's action in walking over

---

6. An argument can be advanced that the admissibility of Detective Brodesser's statements about the serial numbers is not controlled by rule 1004. Although these statements have all the indicia of mere secondary evidence, it might be said that they constitute something more; Brodesser was testifying about what he had observed first hand during the course of his search of the Marcantoni residence. Whether he was testifying from present recollection refreshed or past recollection recorded, see Fed.R.Evid. 803(5), however, cannot be determined with certainty from the record. In questioning Brodesser about the serial numbers on direct examination, the prosecutor did not undertake to establish, as a preliminary matter, whether the witness was actually able to remember the precise serial numbers he had noted on the two $10 bills in issue; instead, he went straight to the heart of the matter, simply asking Brodesser to repeat the serial numbers he had seen and recorded. The likelihood is, of course, that even with the benefit of his notes, Brodesser could not recall the precise serial numbers and that his testimony was strictly a recital of what he had recorded.

We think it not far fetched to say that Brodesser's notes constituted, in the language of rule 803(5), "[a] memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable him to testify fully and accurately, shown to have been made . . . by the witness when the matter was fresh in his memory and to reflect that knowledge correctly." We should point out, however, that if Rule 803(5) is considered the sole basis of admissibility, the notes themselves, as distinguished from a recital thereof, should not have been received as an evidentiary exhibit in the Government's case-in-chief. As the rule states, "[i]f admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party."

7. In their briefs, the Marcantonis argued that the fourth amendment precluded the police from coming anywhere on their property without a search warrant. At oral argument, however, they receded from this position, conceding that the police had a right to effect a warrantless entry for the limited purpose of making an investigative inquiry. See, e. g., Nordskog v. Wainwright, 546 F.2d 69, 72 (5th Cir. 1977); United States v. Knight, 451 F.2d 275, 278 (5th Cir. 1971).

8. The Marcantonis have never specified precisely what tainted evidence led to their convictions. The only fruits of the search that we can find to have been submitted to the jury were the VIN and the two color photographs of the Rambler. All other evidence traceable to the search was suppressed by the district court.

to the Rambler to observe its VIN through the windshield constituted a search for which a warrant was required,[9] the independent evidence of the Marcantonis' guilt is so overwhelming as to render the admission of the VIN and the two photographs in evidence harmless beyond a reasonable doubt. *Chapman v. California.*

As we have pointed out, in addition to proving that Suzanne Marcantoni's Rambler was the getaway car and that the Marcantonis were in possession of some of the Bank's bait money three days after the robbery, the prosecution offered the testimony of several eye witnesses who identified the Marcantonis as the culprits. Two of the Bank's tellers, Debra Beckerink and Susan Young, had an ample opportunity to observe the gunman during the course of the robbery and unequivocally identified Charlie Marcantoni as the man. Record, vol. 3, at 13, 42. They had picked Marcantoni's photograph from an array of photographs shown them shortly after the robbery and had no difficulty in making an independent identification of him in the presence of the jury. A third teller, Tina Brown, whose window the gunman initially approached, was not asked, by the prosecutor on direct examination or the defense on cross, whether she could identify the gunman. She did say that he was a white male with light colored hair, *id.*, vol. 2, at 13, 23–24, two features of Charlie Marcantoni.

Charles H. Palleja identified the Marcantonis as the occupants of the getaway car

he had followed. *Id.*, vol. 3, at 116. The defense made no attempt to impeach his identification. Lawrence Ellington, another bystander, had seen the robber run to the Rambler and jump in the back. He testified that the vehicle was driven by a woman with dishwater-blond, upswept hair. *Id.*, at 73. Palleja had made the same observation about the woman's hair, *id.*, at 108, as had the Marcantonis' next door neighbor, Richard Caufman, earlier that morning. *Id.*, vol. 5, at 242. Ellington was unable to identify the robber, but he selected Suzanne Marcantoni from a photograph of an earlier police lineup, Government Exh. No. 3a, as one most closely resembling the woman. *Id.*, vol. 3, at 80.

Both Marcantonis took the stand and presented the same alibi defense. On the morning of the robbery they claimed to have been at home with Jim Tune (Suzanne's brother) watching television until the conclusion of the Flintstones program at 9:00 o'clock. *Id.*, vol. 4, at 159. A few moments later (about the time the robbery was in progress, according to the Government's proof), they purportedly drove to the Food World supermarket where they stayed for forty-five minutes, leaving shortly before 10:00 a. m. *Id.*; *id.*, vol. 5, at 71–72.

Four people saw the Marcantonis at Food World that morning, but none placed them there before 9:30 a. m. *Id.*, vol. 3, at 154, 165; *id.*, vol. 5, at 181, 191. The Food World was but a half-mile from the Bank,

**9.** The Government contends that our en banc decision in *United States v. Johnson*, 431 F.2d 441 (5th Cir. 1970) (per curiam), forecloses the argument that a warrant was required to authorize Brodesser's examination of the VIN through the windshield. *Johnson* held on its facts, alternatively, that the viewing of the VIN was either not a search or it was a reasonable search that could be made without a warrant. The court noted that the officers were lawfully on the property, having obtained the resident's consent, when they observed the VIN. An argument can be made that the en banc court did not answer the question whether a warrantless viewing of a VIN by officers not entitled to approach the vehicle can pass fourth amendment muster, especially in the absence of exigent circumstances. Subsequent decisions of this court dealing with this type of intrusion

have not required an answer to this precise question. *See, e. g., United States v. Sherriff*, 546 F.2d 604 (5th Cir. 1977) (recording VIN numbers in plain view upheld where automobile parked in area open to public); *United States v. Williams*, 434 F.2d 681, 683–84 (5th Cir. 1970) (viewing of VIN either not a search or a reasonable search where vehicle owner in custody and automobile at police station), *cert. denied*, 401 U.S. 1011, 91 S.Ct. 1262, 28 L.Ed.2d 547 (1971). In view of our disposition of the Marcantonis' fourth amendment claim of error, we need not face the issue, which may have been resolved by the Supreme Court's recent decision in *Rakas v. Illinois*, —— U.S. ——, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), whether the viewing of a VIN is a search and, if so, one that must be supported by a warrant.

**1332**

*id.*, vol. 3, at 156; hence, there was ample time for the Marcantonis to have committed the robbery and driven to the supermarket. In short, these witnesses, two of whom were called by the defense, thoroughly impeached the alibi defense.

The Marcantonis attempted to buttress their alibi defense by explaining away their apparent possession of several hundred dollars in currency, including part of the Bank's bait money, immediately following the robbery. They offered an explanation for most of the money they had spent or still had in their possession ($326) by the time Detective Brodesser searched their residence on Monday, August 9. They said $400–$500 of it had been given to them by Charlie Marcantoni's father the night before the robbery. *Id.*, vol. 5, at 42–43, 108. In rebuttal, the Government called the father, Angel Marcantoni. He categorically denied that he had given the Marcantonis any money, and he added that he had not seen them for several months prior to the robbery. *Id.* at 198–99. He was corroborated by the lady with whom he lived in Clearwater, Florida, and by one further fact. The Marcantonis said that Angel Marcantoni had come to Tampa to give them the money. *Id.* at 42, 108. The latter testified that he could not have made the trip, because he no longer drove a car; due to several DWI convictions, the state had taken his license away. *Id.* at 219.

### IV

For the reasons we have stated, the convictions of Charlie and Helen Suzanne Tune Marcantoni are AFFIRMED.