**UNITED STATES of America,**
**Appellee,**

v.

**Michael BARRAGAN–MARTINEZ,**
**Appellant.**

**No. 74–1030.**

United States Court of Appeals,
Ninth Circuit.

July 16, 1974.

Rehearing Denied Nov. 19, 1974.

Michael J. McCabe (argued), of Federal Defenders of San Diego, Inc., San Diego, Cal., for appellant.

Michael E. Quinton, Asst. U. S. Atty. (argued), San Diego, Cal., for appellee.

Before ELY and GOODWIN, Circuit Judges, and EAST,* District Judge.

## OPINION

ALFRED T. GOODWIN, Circuit Judge:

We reverse this conviction for conspiring to transport and transporting aliens, because the arrest of the defendant and his subsequent identification by one of the illegally transported aliens were the products of an illegal stop by immigration agents. *See* Almeida-Sanchez v. United States, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973).

The officials had probable cause to stop a truck loaded with aliens, the license number of which had been given them by a reliable informer, but the officers had no more than a suspicion that the green Ford the defendant was driving was connected with the ongoing smuggling operation which they were investigating. The officers nonetheless stopped the defendant and detained him

long enough for one of the smuggled aliens to identify him as a participant in the enterprise.

We have examined every fact testified to in court, and, putting aside the arguments of government counsel on the scope of "common knowledge" and facts outside the record, we have concluded that if the government had a constitutional basis for stopping the defendant's automobile, that basis was never explained by the evidence produced in court.

The government's evidence was as follows:

1. A confidential informant told the Border Patrol that on Monday, September 17, 1973, twelve to fifteen illegal aliens would be leaving a drop house near Heber, California, in a red pickup truck bearing a Mexican license plate. The informant also gave the license-plate number.

2. That day, a border-patrol agent went to the drop house near Heber, but found no aliens. Assuming that the aliens had already left, he radioed this information to other agents.

3. A second agent, in an unmarked car, located a red pickup truck with a Mexican license number corresponding with that given by the informant. The truck was traveling north on Highway 111, just south of Highway 80, approximately five miles north of the house in Heber.

4. Shortly after 2:30 in the afternoon, two more agents, also in an unmarked car, were called to the scene and joined a procession of four vehicles traveling east on Highway 80—the red pickup truck, a white Chevrolet, a green Ford, and an unmarked car carrying the other agent.

5. All five vehicles were driving approximately 40 miles per hour in a 60 mile-per-hour zone. For part of the time, the white Chevrolet was between the pickup truck and the green Ford.

* The Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

6. Three miles east of the intersection of Highways 111 and 80, the pickup truck, the green Ford, and the two border-patrol cars turned left on Highway 115. The white Chevrolet continued east on Highway 80.

7. The green Ford remained two to three car-lengths behind the pickup truck on Highway 115. Traffic was light.

8. After traveling ten miles north on Highway 115, the pickup truck, still followed by the green Ford, turned right on Highway 78.

9. Two miles east on Highway 78, both the pickup truck and the green Ford were stopped by the agents.

10. There had been no communication between the pickup truck and the green Ford.

There was absolutely no testimony about alien smuggling techniques. At oral argument counsel for the government asked us to take judicial notice of what he claimed was the familiar technique of using a "scout car" in front of the "load car" carrying the illegal aliens. *See* United States v. Baca, 368 F.Supp. 398, 407–408 (S.D.Cal.1973). Here, however, defendant's car was following the truck with the aliens. Although we do not doubt that alien smugglers occasionally operate in this fashion, we refuse to take judicial notice of a smuggling *modus operandi* employing a scout car behind the load car.

In sum, on the record made here, we are unable to say that the agents had a founded suspicion to justify stopping the Ford sedan. The agents knew that the green Ford followed somewhat closely behind the red pickup truck on a weekday afternoon for approximately fifteen miles through two turns. There was no testimony as to other facts, if any existed, which might have elevated the suspicion of the agents to the founded suspicion required by our decisions. United States v. Jaime-Barrios, 494 F.2d 455 (9th Cir. 1974), cert. denied, 417 U.S. 972, 94 S.Ct. 3178, 41 L.Ed.2d 1143

(1974); United States v. Bugarin-Casas, 484 F.2d 853 (9th Cir. 1973), cert. denied, 414 U.S. 1136, 94 S.Ct. 881, 38 L.Ed.2d 762 (1974); United States v. Barron, 472 F.2d 1215 (9th Cir.), cert. denied, 413 U.S. 920, 93 S.Ct. 3063, 37 L.Ed.2d 1041 (1973); United States v. Roberts, 470 F.2d 858 (9th Cir. 1972), cert. denied, 413 U.S. 920, 93 S.Ct. 3071, 37 L.Ed.2d 1042 (1973); Wilson v. Porter, 361 F.2d 412 (9th Cir. 1966).

However, the government contends that even if the stop of Barragan-Martinez's vehicle was illegal, that stop produced no evidence that was used against him, and there is nothing to suppress. The record belies this contention. Had the agents not detained Barragan-Martinez, they would not have had the opportunity, while he was still at the scene, to question the driver and passengers of the truck and to learn that the driver of the green Ford was part of the smuggling operation. The driver of the pickup truck first met the defendant two days before the arrest, and the passengers first met him at the drop house in Heber. Apparently, neither the driver nor the passengers knew the defendant's full name nor would they have been able to direct the Border Patrol to him had he not been detained at the scene. They knew the defendant only by his appearance, and his appearance would not have been available for inspection had he not been rendered immobile. Hence, the on-the-scene identification of Barragan-Martinez, as well as the in-court identifications, were fruits of his illegal detention and must be suppressed.

Suppression here clearly serves the purpose of the exclusionary rule—to safeguard Fourth Amendment rights by deterring future unlawful police conduct. Terry v. Ohio, 392 U.S. 1, 29, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Mapp v. Ohio, 367 U.S. 643, 656, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Elkins v. United States, 364 U.S. 206, 217, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). By denying the government the use of identifications of Barragan-Martinez which flowed direct-

ly from the illegal stop of his car, the government presumably will be encouraged not to stop vehicles without at least a founded suspicion that the vehicle's occupants are or have been engaged in criminal conduct.

Reversed and remanded.