UNITED STATES of America, Plaintiff-Appellee,

v.

Jose Arturo PORTILLO–REYES, Defendant-Appellant.

No. 75–1940.

United States Court of Appeals, Ninth Circuit.

Nov. 17, 1975.

Rehearing and Rehearing En Banc Denied April 2, 1976.

James Meyers, Asst. U. S. Atty. (argued), Harry D. Steward, U. S. Atty., William E. Derbonne, Asst. U. S. Atty., on the brief, San Diego, Cal., for plaintiff-appellee.

Michael J. McCabe (argued), of Federal Public Defenders, San Diego, Cal., for defendant-appellant.

## OPINION

Before ELY and WRIGHT, Circuit Judges, and EAST,* Senior District Judge.

EAST, Senior District Judge:

## THE APPEAL

The defendant-appellant Jose Arturo Portillo-Reyes (hereinafter referred to as Reyes) appeals from his judgment of conviction and sentence to custody on four counts of violating 18 U.S.C. § 371 and 8 U.S.C. §§ 1324(a)(1), 1324(a)(2), and 1324(a)(4). We reverse and remand.

## THE PROCEEDINGS IN THE DISTRICT COURT

Reyes and a co-defendant Rogelio Reyna-Romero (hereinafter referred to as Romero) were indicted on one count of conspiracy and nine substantive counts of smuggling and unlawfully transporting aliens into the United States in violation of the congressional Acts above.

The charges against Romero upon the Government's motion were severed for non-trial disposition.

Prior to trial, Reyes moved for an order suppressing the use as evidence against him of, *inter alia*:

(a) Any and all testimony that a key found upon the person of Romero following his arrest was a "fit" to the vehicle occupied by Reyes;

(b) The photographs and passport taken from the vehicle occupied by Reyes; and

(c) Any incriminating statement of Reyes after being advised of his "Miranda rights" and arrested.

The District Court held an evidentiary hearing and orally denied the motion. The District Court made no findings of fact in support of the minute order denying the motion, except the oral statement that "[Senior Patrol Agent Endler (hereinafter referred to as Endler)] had

the key to the car which I think will give plenty of probable cause."

Reyes was tried to a jury and convicted of the conspiracy count and three counts of illegal transportation of three aliens. Acquittals were entered on the remaining six counts. Reyes was sentenced on:

(a) The conspiracy count to a three year probationary term of suspended sentence on the condition that he be confined in a jail type or treatment institution for a period of 90 days, per 18 U.S.C. § 3651; and

(b) To custody on each of the three substantive counts for a period of 90 days, to run concurrently with each other and the 90 day sentence under Count 1.

## FACTS

On February 6, 1975, at about 4:00 a.m., border patrol agent Ted Jordan was patrolling a dirt roadway in Calexico, California. The roadway is bounded on one side by the United States-Mexican border fence and on the other side, approximately 50 feet distant from the fence, by a housing project. The area was notoriously known to the agent for alien and narcotic smuggling.

Agent Jordan observed a group of people crossing the roadway behind him. They headed from the fence toward the housing project. He requested assistance and was joined by two other agents. In a search, the agents apprehended three women and a man lying in a ditch and weeds. The footprints of the four were found to lead from a hole in the border fence to their respective hiding places. When the four were apprehended, they claimed Mexican citizenship without right of entry to the United States. It was later determined at the patrol office that the three women were citizens of El Salvador. The male citizen was identified as Romero.

---

* Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

A search of Romero's person produced a key ring holding a residence key and three automobile keys, one each for a Datsun, Opel, and Volkswagen. The automobile keys were given to Endler. Through past experience in apprehending participants in smuggling and illegal trafficking of aliens, Endler knew that a load car is usually in the area when aliens, particularly women, illegally cross the border. Endler took the keys to the parking area adjacent to the housing project for the purpose of conducting a search for a Datsun, Opel, or Volkswagen automobile. He observed about 35 automobiles in the parking area, none of which were Opels or Datsuns, but one was a Volkswagen in which a man was lying in the front seat.

Endler called for assistance. Agent Keyser responded, and when he arrived, they knocked on the window. Reyes rolled down the window, and when asked about his citizenship, he replied that he was a citizen of El Salvador. He showed his green card alien registration (legally migrating alien) and said "He was going to Los Angeles." The Government's brief states: "At this time the agents advised Reyes of his rights and placed him under arrest. Agent Endler then inserted the Volkswagen key taken from Romero into the car door lock and it unlocked the door and also activated the ignition system." [1] The agents determined that Reyes also had a key to the automobile. They conducted a search of the interior of the Volkswagen and discovered several photographs of Romero in the glove compartment and a passport in the rear in the name of another El Salvadorian.

The Government's case against Reyes was bottomed upon the testimony of co-defendant Romero, who was a brother-in-law of Reyes, and two of the women aliens. Agents testified about the Volkswagen key found on Romero, their experience and expertise indicating a presence of a load car in like situations, the key found on Romero fitting Reyes' Volkswagen, and the finding of the photographs and passport. The photographs and passport were also received in evidence.

The testimony of the third woman was exculpatory of Reyes and the subject of the basis of Issue 2, *infra*. Romero testified that he had a key to his brother-in-law's Volkswagen because he drove his pregnant sister on shopping tours at various times and forgot to return the key. This statement exploded a suspicious circumstance first relied upon by the agents.

## ISSUES FOR REVIEW

Reyes' contentions present the two following issues:

(1) Whether the detention of Reyes and the border patrol agent's insertion of the Volkswagen key into ·the door of the vehicle of Reyes constituted an arrest and incidental search, and, if so, whether the facts known to the agents at the moment of the arrest and search provided probable cause for the arrest and search.

(2) Whether the court's interrogating the alien called by Reyes, ·inquiring if the witness realized that she was sworn to tell the truth and if she were telling the truth and asking her if she realized that she might be prosecuted for not telling the truth, prejudiced Reyes and deprived him of a fair trial.

1. Agent Endler testified at the suppression hearing that Reyes was advised of his rights *before* the key was tried and found to fit the Volkswagen's left front door. On cross-examination, Endler altered his testimony by stating Reyes was placed under arrest "[a]fter we tried the key in the door lock." Later Endler again altered his testimony by stating "[a]t that time after he admitted that he was from El Salvador, we advised him of his rights and placed him under arrest; then I got the Volkswagen key and tried it in the door of the Volkswagen and it fit the door." The Government's version is in line with the District Court's oral statement and we accept that version as true.

## DISCUSSION

*Issue 1:*

The crux of Reyes' contention of error is that at the moment of his arrest, the agents did not have probable cause for the arrest and search of the Volkswagen. Accordingly, claims Reyes, the arrest and incidental search and seizure violated his Fourth Amendment immunities.

■ Whether the arrest preceded the search or vice versa is immaterial as the requirement for the existence of probable cause is mandated to justify either by the agents. The mandate of the existence of probable cause to make a valid arrest is delineated in the following language of the Supreme Court in *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964) at 91, 85 S.Ct. at 225:

> "The constitutional validity of the search in this case, then, must depend upon the constitutional validity of [Reyes'] arrest. Whether that arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that [Reyes] had committed or was committing an offense. *Brinegar v. United States,* 338 U.S. 160, 175–176, 69 S.Ct. 1302, 1310–1311, 93 L.Ed. 1879; *Henry v. United States,* 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134. 'The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating . . often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice.' *Brinegar v. United States, supra,* 338 U.S. at 176, 69 S.Ct. at 1311."

■ We are satisfied that under the "reasonable expectancy of privacy" doctrine of *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the insertion of the key in the door of the Volkswagen, to see if it fit constituted the beginning of the search.

The requirement of the existence of probable cause to validate the search is delineated in the following language of the Supreme Court in *United States v. Ortiz,* 422 U.S. 891, at 896, 95 S.Ct. 2585, 2588, 45 L.Ed.2d 622 (1975):

> "[Some degree of discretion] to search private automobiles is not consistent with the Fourth Amendment. A search, even of an automobile, is a substantial invasion of privacy. To protect that privacy from official arbitrariness, the Court always has regarded probable cause as the minimum requirement for a lawful search. *Almeida-Sanchez [Almeida-Sanchez v. U. S.,* 413 U.S. 266 (1973)], at 269–270, 93 S.Ct. [2535] at 2537–2538 [37 L.Ed.2d 596]; *Chambers v. Maroney,* 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970)."

While it might be argued that the agents would not be required to obtain a warrant to search the Volkswagen under the holding in *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), "[a]utomobile or no automobile, there must be probable cause for the search." *Almeida-Sanchez v. United States,* 413 U.S. 266, 269, 93 S.Ct. 2535, 2537, 37 L.Ed.2d 596 (1973).

The Government does not claim that the search of the Volkswagen was a "border search" as such. It contends only that the arrest of Reyes and the search of the vehicle were based on the agents' probable cause belief that the parked Volkswagen and its occupant (Reyes) had been or was engaged in the commission of an offense. The Government further contends that such probable cause belief arose from:

(a) The specific facts known to the agents, together with the rational inferences arising therefrom and from their expertise and knowledge of the *modus operandi* of alien smugglers at the borders (a loading car waiting in the wings

for the arrival of the illegally entered foot-crossing aliens), prior to the window tap; plus

(b) Reyes improbable reply that "He was going to Los Angeles."

Again we note that the District Court made no specific findings of fact on the existence of probable cause to either arrest Reyes or search the Volkswagen. So, like the Supreme Court in *Beck, supra,* at pages 92 and 93, 85 S.Ct. at page 226, we are left to our own search and "after giving full scope to the flexibility demanded by 'a recognition that conditions and circumstances vary just as do investigative and enforcement techniques,' we hold that the arrest of [Reyes, and the search of the Volkswagen] cannot on the record before us be squared with the demands of the Fourth . . . Amendment."

■ Our examination of the record reveals that at the moment Endler tapped on the front window of the Volkswagen with the view of investigating the situation, the agents were aware of only the following specific articulable facts, together with rational inferences from those facts, that reasonably warranted suspicion that the Volkswagen was being used in an unlawful enterprise. *Ortiz, supra,* at 884–87, 95 S.Ct. 2582–83.

(1) Four aliens had shortly before made illegal entry into the United States by foot;

(2) One alien had in his possession an assortment of keys which by indication thereon were keys for a residence, a Datsun, an Opel, and a Volkswagen automobile;

(3) A rational inference from his expertise that an automobile may be in the area for use as a load car to carry the four illegally entered aliens to a more distant point within the United States;

(4) The suspicious circumstances of a man lying in the front seat of the Volkswagen automobile parked at approximately 4:30 a. m. in the parking lot of a housing project adjacent to the area of the arrest of the four aliens; and

(5) The suspicious circumstances of one of the aliens carrying a Volkswagen key and a Volkswagen automobile being parked in the area.

We decline to accept as rational the inference that the Volkswagen key held by the agent was an operating key for the parked Volkswagen and the second inference based upon it that the vehicle was to be a load car for transporting the four aliens. To do so would be building an inference upon an inferred fact. Without the inference that Reyes' parked Volkswagen was being used by a confederate as a load car for the ultimate transportation of one or more of the four aliens, the agent would be arbitrarily selecting the legally parked and occupied Volkswagen over any other Volkswagen located where Romero had been or was going. The only facts known to the agents about Romero was that he was of Mexican citizenship, having just illegally entered the United States, and had possession of the ring of keys. Before the agents could rationally infer there was any connection between the parked Volkswagen and its occupant (Reyes) with Romero, the agents would have had to determine the *fact* of a key fit through a search of the Volkswagen by trying the key in the lock.

Even though there was not probable cause, we are satisfied that the agents did have reasonable grounds for a "founded suspicion" that the parked Volkswagen automobile and the occupant (Reyes) were connected with the illegal entry of the four aliens. Such a "founded suspicion" justified and rendered reasonable the agent's window-tap invasion of Reyes' privacy to ascertain his identity and to ask for an explanation of the suspicious circumstances. *United States v. Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

"[W]e hold that when an officer's observations lead him reasonably to suspect that a particular vehicle may

[transport] aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion. As in *Terry,* the stop and inquiry must be 'reasonably related in scope to the justification for their initiation.' 392 U.S., at 29, 88 S.Ct. [1868] at 1884. The officer may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause." At 881-82, 95 S.Ct. at 2580.

"[O]fficers on roving patrol may [detain] vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the [Volkswagen was being used for transporting] aliens who may be illegally in the country." At 884, 95 S.Ct. at 2582.

The Supreme Court's holding in *Ponce, supra,* validates the long line of decisions of this court establishing the "founded suspicion" doctrine of justified stops. Lately this court in *United States v. Holland,* 510 F.2d 453 (9th Cir. 1975), held at 455:

"'A brief [detention] of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.' *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972)." *See United States v. Barragan-Martinez,* 504 F.2d 1155 (9th Cir. 1974), and the therein cited progeny of *Wilson v. Porter,* 361 F.2d 412 (9th Cir. 1966).

■ As an alternate ground to justify the arrest of Reyes, the Government urges us to accept Reyes' reply that "He was going to Los Angeles" as improbable, hence deceiving, and thereby supplying the necessary additional articulable facts to "convert" or "ripen" the "founded suspicion" to stop into a "probable cause" to arrest Reyes and search the Volkswagen.

The decisions of this court are replete in establishing the doctrine of a "founded suspicion" to stop for investigatory detention being converted or ripened into a probable cause to arrest or search through the occurrence of after-the-stop facts and incidents. *See generally United States v. Jaime-Barrios,* 494 F.2d 455 (9th Cir. 1974); *United States v. Bugarin-Casas,* 484 F.2d 853 (9th Cir. 1973); *United States v. Barron,* 472 F.2d 1215, 1217 (9th Cir. 1973); *Duprez v. United States,* 435 F.2d 1276 (9th Cir. 1970); and *Arnold v. United States,* 382 F.2d 4 (9th Cir. 1967).

The Government relies primarily upon *Arnold, supra* (pre-*Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)), wherein the police officer approached the defendant, an identified suspected bank robber mingling in the street crowd, and asked him to take his hands from his pockets and step away from the crowd, and then asked him what he was doing at the bank. The defendant replied, "What bank?" The officer asked him what he was doing in town. The defendant replied, "Nothing." The officer then began a pat down and noticed a large bulge at defendant's beltline and felt something hard. The officer then exclaimed, "It's a gun!" and another officer seized the defendant's arms and a fully loaded pistol was removed from the defendant's clothing. The defendant urged that his arrest—when he was asked to step away from the crowd or, alternately, when his arms were pinioned—was without probable cause and a subsequent search producing a gun was, therefore, tainted. The court held at page 7 that the brief on the scene detention for limited investigative inquiry satisfied the test of reasonableness under *Wilson, supra.* This court then at page 8 concluded that the defendant's answer to the officer's first question "was patently intended to deceive," and "was sufficient to *convert* the officer's reasonable suspicion into reasonable belief that [defendant] had

joined in the [bank robbery]" and further "the search which produced the weapon was an integral part of, and incident to, a process of arrest which was then supported by probable cause."

It is manifest to us that the replies given by the suspected bank robber in *Arnold, supra,* were indeed evasive and deceitful. However, in the case of Reyes, the agent's testimony revealed nothing uncooperative about Reyes' response in rolling down the window and making ready and quick answer to the agent's questions, that he was an El Salvadorian lawfully in the United States as a non-citizen worker.

Reyes' vehicle was legally parked, and while the hour was suspicious, early starts for a drive from Calexico to Los Angeles are not per se suspicious. The questioning and replies of Reyes just do not match the pattern of those in *Arnold, supra.* We reject the suggestion that the reply "He was going to Los Angeles" when taken in the context of the investigation conversation was in anywise improbable or deceiving, and thus distinguish the facts of *Arnold, supra,* from those here present.

A fair reading of Endler's testimony clearly reveals that Reyes' revelation of joint citizenship with the three women aliens from El Salvador triggered the giving of the *Miranda* litany and immediate arrest of Reyes. Yet a south of the border nationality per se is not sufficient to raise even a founded suspicion to stop. *Cf. United States v. Mallides,* 473 F.2d 859, and *Bugarin-Casas, supra,* at 855.

We have analyzed above all of the facts, circumstances, and lawful rational inferences therefrom within the knowledge of the agents at the moment of Reyes' arrest. We unhesitantly conclude and hold that none of the agents had probable cause to make that arrest within the mandated definition in *Beck, supra.*

■ Lastly the Government urges that the fruits of the search, namely, the photographs of the brother-in-law Romero and the passport of the unidentified female, were harmless error. The Government fails to recognize the significance of the incriminating testimony of the finding of the key, the resulting inference of a load car's existence, and the key fit. In any event we cannot say that the admission in evidence of that testimony and the photographs and passport were harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We believe the testimony of the key incident and its fit was highly prejudicial to Reyes.

*Issue 2:*

In view of our holding on Issue 1 and the necessity of a new trial for Reyes, we do not reach Issue 2. Furthermore, we do not visualize a renewal of the issue on a new trial. *See United States v. Pena-Garcia,* 505 F.2d 964, 967 (9th Cir. 1974); *United States v. Malcolm,* 475 F.2d 420 (9th Cir. 1973).

The judgment of conviction and sentence of Reyes in the District Court is reversed and the cause remanded for further proceedings consistent herewith.

Reversed and remanded.

EUGENE A. WRIGHT, Circuit Judge (dissenting):

I am obliged to dissent. The majority opinion acknowledges that the government agents had reasonable ground for a "founded suspicion" that appellant's automobile and its occupant were connected with the illegal entry of the four aliens. This, says the majority, "justified and rendered reasonable the agent's window-tap invasion of Reyes' privacy to ascertain his identity and to ask for an explanation of the suspicious circumstances."

The opinion itself states that "[t]he decisions of this court are replete in establishing the doctrine [that] a 'founded suspicion' to stop for investigatory detention [can be] converted or ripened into a probable cause to arrest or search through the occurrence of after-the-stop facts and incidents." But the opinion then says that the agents lacked proba-

ble cause since they had not determined that the key found on Romero fit Portillo-Reyes' car prior to the search. All of this is based on the premise that "the insertion of the key in the door of the Volkswagen to see if it fit constituted the beginning of the search."

No authority is cited in support of this premise. Precedent seems to be to the contrary. In *People v. Carroll,* 12 Ill. App.3d 869, 299 N.E.2d 134 (1973), *cert. denied,* 417 U.S. 972, 94 S.Ct. 3180, 41 L.Ed.2d 1144 (1974), it was held that

> [n]o constitutional right, personal to the defendant, was violated when Officer Tillrock merely inserted the key [into the apartment door accessible from a common hallway] and learned that the tumbler could be turned by it.

299 N.E.2d at 139.

> It would have been a different case had the key been obtained in violation of some constitutional right of the defendant. . . . Of course, the mere fact that a police officer has lawful possession of a citizen's key does not confer an unlimited license to use it. However, the legitimate interests of proper crime investigation allow what was done in this case.

*Id.* at 140 (citations omitted).

We have held that police may inspect a vehicle for the limited purpose of ascertaining ownership on less than the probable cause needed to conduct a search, *United States v. Brown,* 470 F.2d 1120, 1122 (9th Cir. 1972), and that the mere checking of the serial number of an automobile by opening the door does not constitute a search within the prohibitions of the Fourth Amendment. *Cotton v. United States,*[1] 371 F.2d 385, 393 (9th Cir. 1967); *accord, United States v. Johnson,* 413 F.2d 1396, 1400 (5th Cir. 1969), *aff'd on rehearing en banc,* 431 F.2d 441 (1970). Several state courts, including those of California and Washington, have reached similar conclusions. *Mardis v. Superior Court,* 218 Cal.App.2d 70, 32 Cal.Rptr. 263, 267 (1963); *State v. Brooks,* 57 Wash.2d 422, 357 P.2d 735, 738 (1960); *People v. Shutter,* 18 Ill. App.3d 855, 310 N.E.2d 694, 695 (1974); *People v. Hart,* 75 Misc.2d 908, 349 N.Y. S.2d 289, 291 (1973).

The insertion of the key into the door of the vehicle was a minimal intrusion, justified by founded suspicion and in furtherance of the legitimate interests of proper crime investigation, and did not constitute a search within the meaning of the Fourth Amendment.

Even if I were to agree with the majority that the insertion of the key into the door was the "beginning of the search," nevertheless I conclude that the search was justified on the basis of probable cause.

The majority suggests, *ante,* p. 849, the district court's failure to make specific findings of fact means that "we are left to our own search," citing *Beck v.*

---

1. In *Cotton,* the defendant had been initially arrested for "disturbing private places." Prior to that arrest, the arresting officer had entered defendant's car and had searched it, looking for registration and for weapons, but had found none. After the arrest an officer remained at the scene until a tow truck came to take defendant's car to the police impound. As a matter of procedure, he made out a "tow slip" on which he included the serial number of the car. The officer had obtained the serial number by opening the left front door of the car and looking at the door post, which became visible when the door was open.

After the police had been given reason to believe that defendant had stolen the car, the F.B.I. was notified. At the police impound lot an F.B.I. agent opened the door of defendant's car to check the serial number, not for inventory purposes as had already been done, but in order to determine if in fact the car had been stolen.

Defendant contended that the examination of the vehicle in the police impound lot was an unlawful search, and that the use of the information thus obtained, *i. e.,* the serial number of the vehicle which was used as evidence against him at trial to prove that the car had been reported stolen, should not have been allowed.

This court, per Judge Duniway, held that since none of the contents of the car was used as evidence against him, but rather only the serial number which was part of the car, this was quite different from looking for evidence that may have been placed in the car by its possessor, and thus did not constitute a search.

*Ohio,* 379 U.S. 89, 92–93, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). In *Beck,* however, the Court found the record "meager, consisting only of the testimony of one of the arresting officers." *Id.* at 93, 85 S.Ct. at 226. In this case, the suppression hearing produced 24 pages of testimony and one diagram. The record is hardly "meager."

The district court is not required to make formal findings of fact at a suppression hearing. *Gaither v. United States,* 134 U.S.App.D.C. 154, 413 F.2d 1061, 1077 (1969).[2] Therefore no negative inference can be drawn from its failure to make formal findings. Rather, we should apply the standard set forth in *Ker v. California,* 374 U.S. 23, 33–34, 83 S.Ct. 1623, 1630, 10 L.Ed.2d 411 (1963):

> We reiterate that the reasonableness of a search is in the first instance a substantive determination to be made by the trial court from the facts and circumstances of the case and in the light of the "fundamental criteria" laid down by the Fourth Amendment and in opinions of this Court. . . . While this Court does not sit as in *nisi prius* to appraise contradictory factual questions, it will, where necessary to the determination of constitutional rights, make an independent examination of the facts, the findings, and the record so that it can determine for itself whether in the decision as to reasonableness the fundamental—*i. e.,* constitutional—criteria established by this Court have been respected.

The majority considers and rejects, as an alternative ground to justify arrest and search. Portillo-Reyes' statement that he was going to Los Angeles, and that he was an El Salvadorian citizen. During the suppression hearing, the district court after viewing a diagram, agreed with the government counsel that Portillo-Reyes "was in the completely wrong place to be on his way to Los Angeles." This factual finding, resolving conflicting versions of the parties, cannot be overturned unless clearly erroneous. *Costello v. United States,* 324 F.2d 260, 261 (9th Cir. 1963), *cited with approval in United States v. Patterson,* 492 F.2d 995, 996 (9th Cir. 1974). *See also Ker,* 374 U.S. at 34, 83 S.Ct. 1623. Here, since evidence would support a finding either way, it cannot be deemed clearly erroneous.

Accepting the district court's finding of fact, one must also accept as reasonable the officers' inference that Portillo-Reyes was lying as to his travel plans. *See United States v. Martin,* 509 F.2d 1211, 1213 (9th Cir. 1975). While it may be, as the majority suggests, that Portillo-Reyes' responses were not "uncooperative," they were at least in part deceitful.

The majority commits still greater error by failing to consider the evidence in this case as a whole. When probable cause is at issue, "each case necessarily turns on its own peculiar facts," and "we must consider *all* the facts known to the officers and consider *all* the reasonable inferences that could be drawn by them before the arrest" or search. *Martin, supra,* at 1213. (Emphasis in original.) While any single piece of evidence, considered in isolation, might be insufficient to establish probable cause,

> [T]he succession of superficially innocent events [may proceed] to the point where a prudent man could say to himself that an innocent course of conduct [is] substantially less likely than a criminal one.

*United States v. Patterson,* 492 F.2d at 997.

Applying these principles to the case before us, I note preliminarily that there are at least three pieces of evidence which even considered alone are not superficially innocent: the inferentially false statement by Portillo-Reyes as to his destination, and items (4) and (5)

---

**2.** Fed.R.Crim.P. 41(f) provides that motions to suppress will be made in accordance with Fed. R.Crim.P. 12. Rule 12(b)(4) provides: ". . . issues of fact shall be determined by the court with or without a jury or on affidavits or in such other manner as the court may direct."

*ante,* p. 849, listed by the majority as "suspicious circumstances."

The majority, in the course of its opinion, recognizes other "specific articulable facts" but does not rely on them on p. 8 as supporting "reasonably warranted suspicion." These are:

(a) close proximity (approximately 50 feet) from the border, *see Patterson,* 492 F.2d at 996;

(b) the experience of the agents that the use of a nearby load car was common *modus operandi* in smuggling female aliens, *see Patterson* at 997;

(c) Portillo-Reyes' response that he was a citizen of El Salvador; and

(d) the agents' prior knowledge that the three female aliens were El Salvadorian.

When these facts, albeit individually not suspicious, are combined with those identified in the next preceding paragraph, I conclude that "in the [district court's] decision as to reasonableness the fundamental—*i. e.,* constitutional—criteria . . . have been respected." *Ker,* 374 U.S. at 34, 83 S.Ct. at 1630. I also conclude that here "a prudent man could say to himself that an innocent course of conduct was substantially less likely than a criminal one." *Patterson,* 492 F.2d at 997.

I would affirm.