**UNITED STATES of America, Plaintiff,**

v.

**Juan Thomas SUAREZ, et al.,
Defendants.**

**No. CR–S–87–282–LDG.**

United States District Court,
D. Nevada.

Dec. 22, 1987.

Thomas R. Green, Asst. U.S. Atty., Organized Crime Drug Enforcement Task Force, Las Vegas, Nev., for plaintiff.

J.E. Ring Smith, Las Vegas, Nev., for defendant Suarez.

Randall Roske, Asst. Fed. Public Defender, Las Vegas, Nev., for defendant Demasi.

Frank Cremen, Las Vegas, Nev., for defendant Guo.

John Graves, Jr., Las Vegas, Nev., for defendant Gonzalez.

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

GEORGE, District Judge.

On October 15, 1987, a federal grand jury sitting in Las Vegas, Nevada, returned a five-count indictment charging Defendants JAMES DEMASI, SHIOW MIE GUO, JORGE GONZALEZ, and JUAN THOMAS SUAREZ with conspiracy to distribute, possession with intent to distribute, and distribution of cocaine in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

On November 20, 1987, Defendant SUAREZ moved to suppress evidence and statements obtained at his residence on the night of his arrest. Defendant contends that all such evidence should be suppressed because the law enforcement agents entered his residence without a warrant, and without Defendant's consent or probable cause and exigent circumstances, in violation of the fourth amendment to the Constitution.

The Government timely opposed Defendant's motion, and on December 9, 1987, the court conducted an evidentiary hearing to establish the pertinent facts. The Government contends that the evidence established probable cause and exigent circumstances to justify the entry of SUAREZ' residence to secure the premises until a warrant could be obtained, and that following the entry, Defendant voluntarily consented to the warrantless search of his home, and knowingly and voluntarily waived his so-called "Miranda rights" before making any incriminating statements.

### Pertinent Facts

This case arose when agents of the Drug Enforcement Administration (hereinafter "DEA") began investigating narcotics trafficking by Co-defendants DEMASI and GUO in September 1987. On September 14, 1987, Special Agent Elizabeth Lathbury made arrangements through John Malone, then a confidential informant, to purchase an ounce of cocaine from Co-defendants DEMASI and GUO. DEMASI told Lathbury that a Cuban male would deliver the cocaine to GUO, who in turn would deliver it to Lathbury at DEMASI's apartment.

While Agent Lathbury waited at DEMASI's apartment for GUO to bring the cocaine, DEA surveillance agents observed a Cuban male meet with GUO outside of her apartment. The Cuban male, with GUO along side, walked to the passenger door of a Ford Taurus, opened the door momentari-

ly, closed the door, walked around to the driver's side of the car, and got in and drove away while GUO returned to her apartment. Twenty minutes later, GUO left her apartment and delivered the cocaine to Agent Lathbury at DEMASI's apartment.

Meanwhile, other surveillance agents followed the Cuban male in the Ford Taurus to an apartment complex at East Bonanza and Roxella streets in Las Vegas, where the agents lost sight of the vehicle. Records from the Department of Motor Vehicles indicated that the Ford Taurus was registered to Defendant JORGES GONZALEZ at 2750 East Bonanza, # 112C, Las Vegas, which address is several blocks or miles west of the apartment complex at Bonanza and Roxella streets.

On September 21, 1987, Agent Lathbury and Malone went to GUO's apartment to arrange a second cocaine purchase. Upon their arrival, Defendant GUO stated that she had placed a call to a pager and that someone would call her back shortly. When GUO received the return call, she arranged for the delivery of two ounces of cocaine, and told Lathbury that a Cuban would bring the cocaine in approximately twenty minutes. Approximately thirty minutes later, Lathbury observed Defendant GONZALEZ approaching GUO's apartment door. Lathbury and Malone were told to wait in GUO's bedroom during the transaction. While in the bedroom, Lathbury overheard GUO and GONZALEZ discussing an apparent mix-up regarding the amount of cocaine that GONZALEZ was supposed to have delivered. GONZALEZ told GUO he would go get the proper amount and return shortly. GUO then told Lathbury and Malone to wait outside of the apartment until GONZALEZ delivered the cocaine.

Surveillance agents then followed GONZALEZ from GUO's apartment to 2750 East Bonanza Street, the address indicated on the registration of GONZALEZ' Ford Taurus. This time, however, GONZALEZ was driving a 1980 gold Datsun, also registered to Defendant GONZALEZ at the same Bonanza address. GONZALEZ remained at that address for approximately ten minutes, and then proceeded to the apartments at Bonanza and Roxella. Again the agents were unable to see which apartment GONZALEZ entered there, however a few minutes later GONZALEZ exited the complex and returned to GUO's apartment. Agent Lathbury also saw GONZALEZ return to GUO's apartment and leave ten minutes later. Immediately thereafter, Lathbury purchased approximately two ounces of cocaine from Defendant GUO.

On October 7, 1987, Agent Lathbury went to GUO's apartment to arrange a third purchase of cocaine. GUO had told Lathbury that GUO could get as much cocaine as Lathbury wanted that day. Upon Lathbury's arrival, GUO placed a call to a pager number and a return call was received. GUO arranged for the delivery of three ounces of cocaine.

Meanwhile, surveillance agents were watching GONZALEZ' apartment at 2750 East Bonanza, # 112C. Shortly after Lathbury went to GUO's apartment, at approximately 8:00 p.m., GONZALEZ left his apartment and drove to the apartment complex at Bonanza and Roxella. This time GONZALEZ was driving a van registered to Defendant JUAN SUAREZ at 2815 Stomas Drive, Las Vegas, Nevada. On this occasion, Special Agent Gary Rodis was able to observe GONZALEZ enter a specific apartment, later identified as 574 Roxella Lane, Apartment C. GONZALEZ remained inside the apartment for approximately three minutes and then he exited through the garage to the apartment. Surveillance agents thereafter followed GONZALEZ to GUO's apartment. Lathbury waited outside while GONZALEZ entered GUO's apartment. When GONZALEZ left, Lathbury purchased the three ounces of cocaine. GUO was arrested immediately, and GONZALEZ was arrested shortly thereafter while driving a few blocks away.

Immediately following GONZALEZ' arrest, the surveilling agents discussed what they should do about the situation at the Roxella Lane apartment. The agents considered securing the residence to prevent the destruction of evidence and the escape of any suspects, however because of the peril inherent in such a situation, the agents decided to first attempt to learn

whether anyone was in the residence or any other circumstances that might exist at the moment. For safety reasons, they decided to approach the situation surreptitiously by returning to the scene in the van which had been driven by GONZALEZ and which the agents seized pursuant to Title 21, United States Code, Section 881.[1] The agents did not consider or attempt to obtain a search warrant at that time.

When the agents drove into the Roxella apartment complex at approximately 10:30 p.m., Agent Rodis identified the garage from which GONZALEZ had exited earlier that evening. At that point, one of the agents in the van activated a garage door opener that was found within the van, and it opened the garage door that Rodis had identified.[2] The agents remained in the van on a common driveway.

Within a minute, Defendant SUAREZ emerged from the house. SUAREZ whistled and motioned to the occupants of the van to come in. Detective Joe Forte then honked the horn of the van once or twice, whereupon SUAREZ approached the van and opened the passenger door. Special Agent Gary Elliott, with his gun drawn, immediately advised SUAREZ, "Federal agents, don't move." SUAREZ then hurriedly moved toward the rear of the van at which point he was detained by the other officers who had been in the vehicle.

SUAREZ was handcuffed and returned to the house while the officers conducted a protective sweep of the premises. Agent Elliott quickly went through the house taking SUAREZ with him and then placed SUAREZ on his knees in the living room until the other officers completed the pro-

tective sweep of the residence. Agent Elliott placed a jacket over SUAREZ' head so SUAREZ would not see any undercover agents involved in the sweep. The entire sweep lasted approximately three to five minutes. Upon conclusion, all officers except Agent Elliott and Officer James Jackson returned to the van. Thereafter, Agent Elliott removed the jacket from SUAREZ' head, helped him to the couch, and explained why they were there.

Within a minute, Agent Elliott read SUAREZ his "Miranda rights", which SUAREZ indicated that he understood and wished to waive. SUAREZ then answered questions regarding his involvement and knowledge of cocaine trafficking from his home and van by himself and Co–Defendant GONZALEZ. Agent Elliott then asked SUAREZ for permission to search his apartment for cocaine. Elliott advised SUAREZ that he did not have to consent to such a search, but SUAREZ said, "It's okay."

Elliott then called Agent Rodis and the other officers back into the house to conduct the search. At that point, Elliott told SUAREZ that he could save a lot of time if he would just tell the agents where the cocaine was located. At first SUAREZ was silent, but then he told the agents where to find the cocaine. The agents seized the cocaine and other paraphernalia and then formally arrested SUAREZ.

### Analysis

 It is well-settled under the fourth amendment that the Government may not enter a citizen's home without a warrant unless there exists probable cause and exigent circumstances or the Government pro-

---

1. Two DEA agents, Gary Elliott and Gary Rodis, and three or four officers of the North Las Vegas Police Department were involved at this point. All of them returned together in the van to the Roxella apartment, later discovered to be SUAREZ' apartment.

2. It should be noted that at this point the agents did not know that the garage door opener found within the van would activate the garage door to the apartment on Roxella Lane. First, although the agents knew that the van was registered to a "JUAN THOMAS SUAREZ", they did not know that SUAREZ lived at the apartment on Roxella Lane. The agents had no idea who, if anyone, lived at the apartment on Roxella Lane, much

less a description of any person who might live there. Except for the vehicle registration on the van, SUAREZ' name was never mentioned in connection with this investigation. Second, the vehicle registration indicated that SUAREZ' address was one different than the address on Roxella Lane. There was really no reason for the agents to believe that the SUAREZ van belonged to anyone living at the apartment on Roxella Lane. The agents had only seen the van on one occasion in connection with this case, and that was when GONZALEZ drove the van from his own apartment to the apartment on Roxella and then to GUO's apartment.

cures a valid consent. *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (entry to arrest); *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (entry to search). Moreover, the Government may not search a home without a warrant or consent even when probable cause and exigent circumstances justify a warrantless entry thereof. *United States v. Curran,* 498 F.2d 30, 36 (9th Cir.1974). The Government may, however, secure the premises under such circumstances until a warrant can be obtained. *Segura v. United States,* 468 U.S. 796, 810, 104 S.Ct. 3380, 3388, 82 L.Ed.2d 599 (1984). Therefore, since the agents entered SUAREZ' apartment without a warrant and without consent, the court must first determine whether probable cause and exigent circumstances justified the intrusion into SUAREZ' home.[3]

### Probable Cause

■ The Government contends that there was probable cause to believe either that GONZALEZ used SUAREZ' apartment as a "stash pad" for his cocaine or that SUAREZ supplied GONZALEZ with the cocaine, because each time the agents surveilled GONZALEZ, he went to SUAREZ' apartment complex for very short periods of time immediately preceding the alleged drug transactions, and on the last date in question, GONZALEZ was actually seen entering and leaving SUAREZ' apartment just before he delivered three ounces of cocaine to Defendant GUO. Moreover, the first time the agents surveilled GONZALEZ, he returned to SUAREZ' complex

after the alleged delivery. The Government further argues that there was probable cause that cocaine was still present in SUAREZ' apartment after GONZALEZ' final delivery because GUO had stated to Agent Lathbury that she could get as much cocaine that day as she had money to buy.

SUAREZ contends that the evidence does not support a finding of probable cause because GONZALEZ was not actually seen at SUAREZ' apartment except on one occasion, and then he was not seen carrying anything to or from SUAREZ' apartment. At that time, the Government was unaware of any other facts pertaining to SUAREZ' apartment or the persons, if any, who lived there. SUAREZ notes that surveillance agents also observed GONZALEZ at his own apartment just prior to each alleged delivery of cocaine, and the Government had no knowledge that GONZALEZ had to pick up his cocaine before delivery.

Under all the circumstances, the court concludes that the agents had probable cause to believe that cocaine was present at SUAREZ' apartment. Direct evidence that contraband is at a particular location is not essential to establish probable cause that the evidence is there. *United States v. Angulo–Lopez,* 791 F.2d 1394, 1399 (9th Cir.1986). Reasonable inferences may be drawn about where evidence is likely to be kept, considering both the nature of the evidence and the type of the offense. *Id.* In drug cases, it is likely that evidence will be found where the dealers live, and where those who traffic drugs consist of a ringleader and assistants, a fair probability ex-

---

**3.** The parties do not seem to dispute that in order to justify the conduct in question, there must have been probable cause and exigent circumstances to enter the residence before the agents activated the garage door opener. It appears that such action would constitute a "search" since there was an intrusion into an area where SUAREZ exhibited a reasonable expectation of privacy, his closed garage. *See Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *cf. United States v. Grandstaff,* 807 F.2d 851, 856 & 856 n. 4 (9th Cir.1987) (court assumed without deciding that insertion of a key into a car door was a search); *United States v. Portillo–Reyes,* 529 F.2d 844 (9th Cir.1975), *cert. denied,* 429 U.S. 899, 97 S.Ct. 267, 50 L.Ed.2d 185 (1976) (suggested insertion

of key into car door was the beginning of a search). That is a novel and interesting question which this court need not address, however, since the court cannot consider conditions that might otherwise establish exigent circumstances if those conditions were created by intentional acts of Government agents. *See, e.g., Curran,* 498 F.2d at 35. That is, if the exigency arises only because of some action on the part of the agents, without which the agents would have had time to obtain a warrant, the courts will not dispense with the warrant requirement. *Id.* Therefore, any exigent circumstances must be capable of justifying the entire "raid" and not simply the actions of the officers after SUAREZ opened the garage door leading into his living room. *Id.*

ists that drugs will be present at the assistant's residence as well as the ringleader's. *Id.*

Although GONZALEZ was never seen carrying anything to or from SUAREZ' apartment, he was not seen carrying anything to or from his own apartment either, and there certainly was probable cause that GONZALEZ was in fact the person who delivered the cocaine. Since surveillance agents were able to determine that GONZALEZ did not go anywhere else between the time he must have received the calls requesting the cocaine and the time he must have delivered it, it can hardly be questioned that GONZALEZ either kept cocaine at his own apartment or he picked it up from SUAREZ' apartment.

Agent Elliott testified that it is not uncommon for drug dealers to keep their drugs at a "stash pad" other than their own home. Moreover, it is unlikely that a drug dealer would stop briefly at the same location every time he was about to make a drug delivery unless he went there to pick up the drugs. It is particularly unlikely that he would stop there otherwise when, as here, he was in a hurry to correct a delivery he had just messed up, ie, when he needed to get more cocaine because he mistakenly did not bring enough the first time. Therefore, it was more probable that GONZALEZ got his cocaine from SUAREZ' apartment than from his own. This probability was sufficient to establish the requisite probable cause to search. *See United States v. Crespo de Llano,* 830 F.2d 1532, 1542 (9th Cir.1987); *see also United States v. Bustamante–Gamez,* 488 F.2d 4, 7–9 (9th Cir.1973), *cert. denied,* 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974).

### Exigent Circumstances

■ The Government contends that it was likely that suspects would escape or that evidence would be destroyed or removed from SUAREZ' apartment before the agents could secure a warrant, and therefore, that there was an immediate need to secure the premises until a warrant could be obtained.[4] Agent Elliott testified that it would have taken several hours to obtain a warrant at that time of night, and the Government noted that it was not possible to obtain a telephonic warrant in this jurisdiction at that time. Agent Elliott also testified that they were unaware how many exits there were from SUAREZ' apartment, and it was very difficult to conduct surveillance in that area even in broad daylight. The agents did not know how many persons, if any, were inside SUAREZ' apartment, whether anyone inside might be expecting GONZALEZ to return with the $3,600 that Agent Lathbury had paid for the cocaine that night, and whether GONZALEZ or GUO or any other person would alert any persons in SUAREZ' apartment of the arrests of GONZALEZ and GUO.

SUAREZ contends that the Government's position is premised upon pure speculation, ie, that articulable facts did not exist to support the warrantless intrusion in this case. SUAREZ further contends that while those possibilities might have existed, there was not a sufficient probability or an imminent danger that the events would occur to support a finding that there was a real exigency in this case to dispense with the warrant requirement.

In *Vale v. Louisiana,* 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970), the Supreme Court enumerated several situations that constitute "exigent circumstances", e.g., hot pursuit of a fleeing felon, a life-threatening emergency, the present destruction of evidence, or an imminent threat that evidence is about to be removed from the jurisdiction. The *Vale* list is not exhaustive; rather, it merely illustrates the sorts of conditions that present sufficient exigencies to dispense with the warrant requirement.

Exigent circumstances are those in which a substantial risk of harm to the persons involved or to the law enforcement process would arise if the police were to

---

**4.** The agents never obtained a warrant because SUAREZ subsequently consented to the search.

*See infra.*

delay a search until a warrant could be obtained. The need for the search must be apparent to the police, and so strong as to outweigh the important protection of individual rights provided by the warrant requirement.

*United States v. Johnson,* 660 F.2d 749, 752 (9th Cir.1981), *cert. denied,* 455 U.S. 912, 102 S.Ct. 1263, 71 L.Ed.2d 452 (1982).

Having read and considered the authorities cited by the parties, and having researched the matter further, the court concludes that there were exigent circumstances to justify the entry in this case. Granted, in some cases where courts have found exigent circumstances, the necessity for immediate action may have been more apparent than it was in this case. However, the court agrees with the Government that had the agents taken the time to procure a warrant, it is quite likely that GONZALEZ would have alerted SUAREZ of his arrest, and SUAREZ in turn would have destroyed the evidence, before the agents could return with the warrant. This alone may have been sufficient to justify the agents' entry to secure the premises. *See, e.g., Crespo de Llano,* 830 F.2d at 1542.

It was also reasonable for the agents to have believed that SUAREZ might have expected GONZALEZ to return immediately following the transaction at GUO's, since GONZALEZ had returned to SUAREZ' apartment after one of two transactions surveilled earlier. Where officers reasonably believe that a drug dealer's source may be alerted to the arrest of the dealer because the dealer failed to return following a drug transaction, there are exigent circumstances to justify entry into the source's home to prevent the destruction of evidence and the escape of suspects. *Id.*

Further, it was reasonable for the officers to have believed that other persons might have been expected to pick up cocaine from SUAREZ' apartment that night. While that belief would not in itself justify an entry without a warrant, it is a factor that can be considered in conjunction with the other factors involved in this case because Agent Elliott testified that it would have been too difficult to surveil the apart-

ment and prevent the removal of evidence without detection. *See Curran,* 498 F.2d at 35–36.

"In determining the reasonableness of police activities, courts must be sensitive to the nature of police investigations and their public interest goals. In the context of undercover clandestine drug investigations, courts must be careful not to 'second guess' the strategy decisions of experienced, skilled, and trained law enforcement officers." *United States v. Mabry,* 809 F.2d 671, 677 (10th Cir.1987). Rather, courts must evaluate the circumstances as they appeared to prudent, cautious, trained officers. *Id.*

Viewing the totality of the circumstances in this case as they would reasonably appear to a prudent law enforcement officer, the court cannot say that it was unnecessary to secure the premises to prevent the destruction or removal of evidence in this case. The court finds especially significant the time of night involved, the difficulty in maintaining surveillance of SUAREZ' apartment, the hours it would have taken to secure a warrant, the recent arrests of Co-defendants GONZALEZ and GUO, and the ready destructibility of the evidence. Considering each of these factors in toto, the court concludes that it was reasonable for the agents to enter SUAREZ' apartment to secure the premises. In similar situations, this circuit has upheld findings that exigent circumstances justified the entry of a suspect's home. *See, e.g., Crespo de Llano,* 830 F.2d at 1542; *United States v. Flickinger,* 573 F.2d 1349, 1354 (9th Cir. 1978), *overruled on other grounds, United States v. McConney,* 728 F.2d 1195 (9th Cir.1984) (en banc); *see also Mabry,* 809 F.2d at 677; *United States v. Kulcsar,* 586 F.2d 1283 (8th Cir.1978); *Curran,* 498 F.2d at 35–36.

Accordingly, the court finds no constitutional infirmity in the entry of SUAREZ' apartment. Further, the *evidence* is undisputed that SUAREZ thereafter unequivocally consented to the warrantless search of his home after being advised that he could require the agents to first obtain a search warrant. Although SUAREZ dis-

putes that he was advised of his "Miranda rights" within minutes of the protective sweep of the premises and prior to any questioning by the agents, the evidence is to the contrary. The evidence is undisputed that SUAREZ stated that he understood and wished to waive those rights. The record does not support SUAREZ' contention that his consent or waiver of rights was the product of coercion, explicit or otherwise. Accordingly, it is

ORDERED that Defendant JUAN THOMAS SUAREZ' motion to suppress (# 30) is hereby denied.