**UNITED STATES of America, Plaintiff,**

**v.**

**Errol Jay MIRMELLI, Defendant.**

**Crim. No. 76–123.**

United States District Court,
D. New Jersey.

July 29, 1976.

Jonathan L. Goldstein, U. S. Atty., by Kevin R. March, Asst. U. S. Atty., Newark, N. J., for plaintiff.

Lowenstein, Sandler, Brochin, Kohl & Fisher, by Matthew P. Boylan, Newark, N. J., for defendant.

## OPINION

LACEY, District Judge.

On May 24, 1976, a motion was made by defendant Mirmelli to suppress evidence obtained in the above-entitled case pursuant to Rules 41(f) and 12(b) of the Federal Rules of Criminal Procedure. A hearing on the motion took place on March 24 and continued to March 25, 1976, prior to the commencement of trial. At the conclusion of the hearing the motion was denied based on the following findings of fact and conclusions of law.

Defendant Mirmelli, on March 22, 1976, piloted an aircraft N815G which departed Opa Locka Airport, Opa Locka, Florida, his flight plan indicating that his destination was Portland International Jetport, Portland, Maine. Stipulation of June 9, 1976. During the flight, the flight plan was amended to reflect that defendant was to land at Teterboro Airport, Teterboro, New Jersey. *Id.* At approximately 1:15 p. m., the aircraft landed at Teterboro Airport and taxied to the Atlantic Aviation area where defendant signed in. A blue Dodge van with New York registration arrived and defendant and three companions began to unload the cargo from the plane into the van. The cargo consisted of approximately 53 numbered boxes. Approximately 35–40 feet away, through a window in the Customs Office, customs inspectors observed defendant and his companions unloading the aircraft. They approached the aircraft and questioned defendant as to the contents of the boxes and the point of origin of both the flight and the cargo. Defendant responded that the boxes contained ceramics and that he had flown up from Florida. The inspectors requested invoices or bills of lading, to which defendant responded that he had none and was unaware of the destination of the boxes. When defendant was asked to open one of the boxes, he refused. Inspector Wood opened one box and found that it contained marijuana. All 53 boxes when opened were found to contain marijuana.

On March 30, 1976, the Grand Jury returned an indictment against defendant charging him with travelling in interstate commerce for the purpose of distributing 1,695 pounds of marijuana and with carrying on said unlawful activity in violation of 18 U.S.C. § 1952. Count II charged him with the knowing possession with the intent to distribute approximately 1,695 pounds of marijuana in violation of 21 U.S.C. § 841(a)(1).

Defendant's motion to suppress is based on two grounds. Defendant argues that the search performed by the customs agents violated the fourth amendment in that the agents did not have the requisite probable cause to support the search. While conced-

ing that customs agents can predicate a border stop on reasonable suspicion rather than probable cause, he denies that the questioning of defendant amounted to a border stop. Finally, defendant contends that even if the reasonable suspicion test was applicable, that standard was not met.

Two types of airports provide for international air traffic. Aircraft arriving from a foreign country may land at either an "international airport" as that term is designated in 19 C.F.R. § 6.13 or a "landing rights airport." According to the Customs Guide for Private Flyers, published by the Department of the Treasury, United States Customs Service, at 3 (1973):

> The term "landing rights airport" means an airport at which permission to land may be granted by the appropriate Customs officer with the concurrence of the Immigration and Naturalization Service, the Public Health Service, and the Animal and Plant Health Inspection Service of the Department of Agriculture. Such landing rights are required before an aircraft may land at an airport which has not been designated for Customs purposes as an international airport.

■ Permanent facilities for inspection and clearance exist at Teterboro and customs inspectors are permanently assigned to that facility. *See* Customs Guide at 25. The Supreme Court in *Almeida-Sanchez v. United States*, 413 U.S. 266, 272–73, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1975), provided that a routine border search may take place at the border itself or at its "functional equivalents." As an example it specified that

> a search of the passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City would clearly be the functional equivalent of a border search.

*Id.* Teterboro Airport, then, is the functional equivalent of the border and customs officials there are empowered to perform border searches.

■ Because of the peculiar problems faced by customs officials in policing borders and international airports, broad inter-

pretation is given to their statutory powers and special standards are applied to their searches and seizures at these places. *United States v. Glaziou*, 402 F.2d 8, 12 (2d Cir. 1968), *cert. denied*, 393 U.S. 1121, 89 S.Ct. 999, 22 L.Ed.2d 126 (1969). The fourth amendment, however, imposes limits on search and seizure powers in order to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *United States v. Ortiz*, 422 U.S. 891, 895, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975); *Camara v. Municipal Court*, 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

■ In delineating the constitutional safeguards applicable in particular contexts, the court must weigh the public interest against the fourth amendment interest of the individual. *United States v. Brignoni-Ponce, supra*, 422 U.S. at 878, 95 S.Ct. 2574; *Terry v. Ohio*, 392 U.S. 1, 20–21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

I note here the substantiality of the public interest in the practice of routine checks for inquiry at border checkpoints, a practice identified as very important from the standpoint of inhibiting illegal drug traffic. While the need to prevent drug traffic is great, the consequent intrusion on fourth amendment interests is rather limited. The stop does intrude to a limited extent on a right to "free passage without interruption," *Carroll v. United States*, 267 U.S. 132, 154, 45 S.Ct. 280, 69 L.Ed. 543 (1925). But the detention is a brief one during which, like that requirement in *United States v. Brignoni-Ponce, supra*, 422 U.S. at 880, 95 S.Ct. at 2580, for an illegal aliens search, all that is required of the pilot is "a response to a brief question or two and possibly the production of a document" evidencing citizenship or the fact that the flight was not international.

■ Some quantum of individualized suspicion is a prerequisite to a constitutional search and seizure in these circumstances although "the Fourth Amendment imposes

no irreducible requirement of such suspicion." *United States v. Martinez-Fuerte,* —— U.S. ——, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976). *See also Almeida-Sanchez v. United States, supra,* 413 U.S. at 283–85, 93 S.Ct. 2535 (Powell, J., concurring); *id.* at 288, 93 S.Ct. at 2535 (White, J., dissenting); *United States v. Biswell,* 406 U.S. 311, 315–16, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972); *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 76–77, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970); *Camara v. Municipal Court, supra,* 387 U.S. at 529–30, 87 S.Ct. 1727; *Carroll v. United States,* 267 U.S. 132, 154, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

Whether it is labelled "reasonable" suspicion, *see United States v. Brignoni-Ponce, supra,* 422 U.S. at 878, 95 S.Ct. 2574; *Terry v. Ohio, supra,* 392 U.S. at 21, 88 S.Ct. 1868, or "founded" suspicion, *see United States v. Rocha-Lopez,* 527 F.2d 476, 477 (9th Cir. 1976); *Wilson v. Porter,* 361 F.2d 412, 415 (9th Cir. 1966), the requirement is that the officers "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio, supra,* 392 U.S. at 21, 88 S.Ct. at 1880.

■ As mentioned earlier, Teterboro Airport is a landing rights airport and aircraft from abroad often land there. Transcript of Suppression Hearing at 52. The Customs Service maintains permanent facilities there. *Id.* at 106. Customs agents at the airport are present for the purpose and are highly trained in the art of detecting illegal importations. 19 C.F.R. § 162.6 (1975). Customs agents are specifically authorized to inspect, examine and search "persons, baggage and merchandise" when a vessel from a foreign country arrives, whether directly or via another place in the United States, under section 467 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1467 (1970). The government has a legitimate concern that materials from abroad will be smuggled in. The plane flown by defendant, a Howard 350 Aircraft, has a long range capacity, according to Deputy Chief Inspector Malone, Transcript at 116, and is therefore capable of bringing in goods from abroad.

The three customs inspectors, Schillizzi, O'Leary and Wood, observed defendant and his companions unloading cartons from a passenger plane. They viewed this occurrence as unusual in that there was a large number of cartons being loaded into the van in a hasty fashion. *Id.* at 9, 76. Inspector Schillizzi noted that this size cargo would normally come on a cargo rather than passenger aircraft. *Id.* at 9. In fact, Teterboro does not have cargo facilities. *Id.* at 76. They, in turn, noticed that defendant and his companions were rapidly unloading the cartons which increased their suspicions. *Id.* at 9, 76. The aircraft was parked in an area to which Atlantic Aviation directs foreign flights. *Id.* at 54–55. In addition, in many cases, unless a pilot notifies customs of his or her flight and arrival, the inspectors are unaware whether a flight or cargo is foreign unless they approach the pilot and ask questions. *Id.* at 3–4, 107.

In *United States v. Brignoni-Ponce, supra,* the Supreme Court held that a roving patrol of the Border Patrol, which stopped defendants near the Mexican border and questioned them about their citizenship when the only ground for suspicion was that the occupants of the vehicle appeared to be of Mexican ancestry, was violative of the fourth amendment. It provided that, because of the importance of the governmental interest in preventing the illegal entry of aliens at the border, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border, when an officer's observations lead him or her to suspect that a particular vehicle may contain illegal aliens, the officer may stop the car briefly and investigate the circumstances that provoke suspicion, but random searches without any reason to suspect illegal activity is unreasonable under the fourth amendment. 422 U.S. at 878–81, 95 S.Ct. 2574. *See also United States v. Moffett,* 522 F.2d 1379, 1381 (5th Cir. 1975); *United States v. Walker,* 522 F.2d 194, 196 (5th Cir. 1975). Any

further detention or search must be based on consent or probable cause. 422 U.S. at 882, 95 S.Ct. 2574.

In *United States v. Walker, supra,* the court elaborated upon a number of factors which may be taken into account in deciding whether reasonable suspicion exists to stop a car in the border area: the characteristics of the area where the car is encountered, its proximity to the border, the usual patterns of traffic on that particular road, previous experience with alien traffic, the driver's behavior (erratic or evasive), whether the vehicle appears overloaded or has an unusual number of people. 522 F.2d at 196. *See also United States v. Diaz,* 503 F.2d 1025, 1026 (3d Cir. 1974); *United States v. Beck,* 483 F.2d 203, 207 (3d Cir. 1973), *cert. denied,* 414 U.S. 1132, 94 S.Ct. 873, 38 L.Ed.2d 757 (1974).

In *United States v. Rocha-Lopez,* 527 F.2d 476 (9th Cir. 1976), the court found that the agent was legally justified in stopping defendant's car and indicated that it was irrelevant that the defendant was ultimately convicted of possession of marijuana rather than alien smuggling, which was the original reason for the stop. At the time of the stop, a reasonable suspicion had existed that aliens were being imported. *Id.* at 478. *See also United States v. Rodriguez Alvarado,* 510 F.2d 1063, 1064 (9th Cir. 1975).

In consideration of the above-mentioned points and analyses, I find that the factors relied upon *sub judice* supported a reasonable belief by the customs agents that the containers being unloaded by defendant contained illegal goods from abroad and they were therefore justified in stopping and questioning him.

■ Thereafter, it is necessary to find that probable cause existed for a search of one of the cartons by the customs agents and I so find based on this set of facts.

The inspectors, after observing defendant and his companions, approached them and identified themselves as customs inspectors. Transcript at 13. Defendant responded that he was from Florida and that they "had nothing to do with this flight." *Id.* at 77–78. Two of the agents stated that they sensed defendant's resentment to their intrusion. *Id.* at 34, 91–92. Moreover, they noticed that the pace of the loading increased during their conversation. *Id.* at 32. They then requested defendant produce documentation, in the form of invoices, waybills and the like, to indicate that his flight was domestic rather than foreign. Defendant could produce none. *Id.* at 14–15, 78. Neither Inspectors Schillizzi nor Wood had encountered a situation where a pilot had no documents for his cargo even when the cargo was being transported for his own company. *Id.* at 46–47, 78–79.

Defendant was then asked the contents of the cartons to which he replied that they contained ceramics, the "life's work" of his boss' wife which were to be put on display in New York. *Id.* at 16, 79. The inspectors noted, however, that the cartons were being tossed rather than carefully placed as would naturally take place with such a shipment. *Id.* at 14, 39, 79. Neither defendant nor his companions knew the destination of the shipment. *Id.* at 16–17.

Inspector Wood noticed the rental agreement for the van on the sun visor which indicated that the purpose of the rental was to move musical instruments. *Id.* at 18–19. Defendant refused to open the carton and requested permission to call his boss at which time the inspectors decided to call their supervisor. *Id.* at 19–20, 82. After a description of the aircraft was given to him over the telephone, Deputy Chief Inspector Malone responded that the description of the aircraft matched a customs profile of aircraft used in smuggling operations. *Id.* at 20–21, 109, 116–17. Malone then ordered Inspector Schillizzi to open and inspect one carton which had not been loaded onto the van. *Id.* at 21–22, 110. Defendant returned stating that he could not reach his boss. The carton was opened by the agents and found to contain a brown vegetative substance, *id.* at 22, 83, which was later stipulated to be marijuana. *Id.* at 22. In total, approximately 1,694 pounds of marijuana were discovered.

The customs agents were told that the materials were ceramics and domestic in origin. Their trained observation led them to believe the former assertion was a falsehood and that the contents were not ceramics. Therefore, the origin of the cartons was also in doubt. Defendant's lack of knowledge as to the destination of the delivery compounded their suspicions. Defendant, who testified at the hearing, did not contradict the testimony of the customs inspectors with respect to any of the above-mentioned series of events. He did not explain where the marijuana was obtained or where it was to be delivered.

The reasonable deduction from this set of facts is that defendant knew the destination and contents of the cartons but did not want to divulge that information. The cartons placed on the van in such a hurried manner were to be taken somewhere. Defendant identified the property as belonging to his "boss". Yet no "boss" was identified, no location of an office was mentioned, and no company name was given.

■ The Supreme Court has stated that probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction. *Adams v. Williams*, 407 U.S. 143, 149, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Draper v. United States*, 358 U.S. 307, 311–12, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). Rather, a court must deal with probabilities. " '[T]hey are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Adams v. Williams, supra*, 407 U.S. at 149, 92 S.Ct. at 1925 (citing *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

In the context of this case, they are the considerations of the reasonable and prudent customs inspectors which must be evaluated. These facts are unlike those in *United States v. Portillo-Reyes*, 529 F.2d 844 (9th Cir. 1975), for example, where the requisite probable cause was found not to exist. The court held that the border patrol agents had reasonable grounds for a founded suspicion that defendant's vehicle was connected with the illegal entry of aliens. *Id.* at 849. However, that suspicion was not converted into probable cause for the arrest made, in that the defendant was cooperative, responsive to the questions asked by the agents and there was no hint of deception. *Id.* at 850–51.

Under this test the totality of the circumstances indicated probable cause for the inspectors to believe that defendant was transporting articles subject to customs inspection and possibly contraband.

■ The activities of customs inspectors or any government agents, as distinguished from those of private persons, come within the boundaries of the exclusionary rule if the conduct is violative of the fourth amendment. *Burdeau v. McDowell*, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921); *United States v. Valen*, 479 F.2d 467, 469 (3d Cir. 1973), *cert. denied*, 419 U.S. 901, 95 S.Ct. 185, 42 L.Ed.2d 147 (1974). In a line of recent cases the Supreme Court has taken a sterner look at the exclusionary rule. While explaining that the prime purpose of the exclusionary rule is to deter future unlawful conduct, it has emphasized that that purpose must be balanced against other interests, for example, the substantial societal costs of applying the rule. *See Stone v. Powell*, —— U.S. ——, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *United States v. Janis*, —— U.S. ——, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976). When they are balanced, the Court has found the furtherance of fourth amendment goals outweighed by the detriment to the criminal justice system. *Stone v. Powell, supra*, at ——, 96 S.Ct. 3037; *United States v. Janis, supra*, at ——, 96 S.Ct. 3021. The Court in *Stone* went even further in its argument, asserting that the guilt or innocence should be the central concern in a criminal case. Often the application of the exclusionary rule instead "deflects the truthfinding process and often frees the guilty." At ——, 96 S.Ct. at 3050. While it may deter unlawful police activity, indiscriminate application of the rule may generate disrespect for the law and the administration of justice. *Id.*

It is not without significance that the box that was opened was on the ground, moving from the airplane to the van. Obviously, a lesser expectancy of privacy is warranted than were this a house search. *See South Dakota v. Opperman,* —— U.S. ——, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976).

I find that in light of the facts before me that reasonable suspicion existed for a stop of defendant and that suspicion matured into probable cause to search the cartons defendant was unloading. *See United States v. Moffett, supra,* at 1381; *United States v. Walker, supra,* 196; *United States v. Rodriguez-Alvarado, supra,* at 1064.

I conclude, therefore, that defendant's motion to suppress the marijuana obtained from the search by customs inspectors must be denied and an appropriate order will be entered.